Paul VALENTINE, Plaintiff,

v.

STANDARD & POOR'S, Defendant.

No. 97 Civ. 0005(SS).

United States District Court,
S.D. New York.

June 24, 1999.

Paul Valentine, Boston, MA, pro se.

Epstein Becker & Green, P.C., New York City, Ronald M. Green, Lawrence Peikes, for defendant.

## OPINION & ORDER

SOTOMAYOR, Circuit Judge.[1]

Plaintiff Paul Valentine, appearing pro se, brings this action alleging that defendant Standard & Poor's ("S & P"), his former employer, discriminated against him in violation of the Americans with Disabilities Act (the "ADA"), as codified, 42 U.S.C. §§ 12101 *et seq.*, and discharged him in retaliation for filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). Defendant moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons to be discussed, the Court grants the defendant's motion.

## BACKGROUND

### I. Statement of Facts

Unless otherwise indicated, the following facts are undisputed. Plaintiff graduated from Hobart College in 1976 with a B.A. in political science, and from Cornell Business School in 1980 with an M.B.A. in finance. (Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Mem.") at 3; Plaintiff's Deposition[2] ("Pl.'s Dep.") at 143–44.) In the early 1980s, plaintiff was diagnosed with bipolar disorder, also known as manic-depressive disorder. (Pl.'s Mem. at 6; Valentine's Affidavit in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment, Exhibit E ("Valentine Aff., Exh. E") at 1.) On March 29, 1982, plaintiff was hired as an Assistant Analyst by S & P, a subsidiary of the McGraw–Hill Companies that employs more than five hundred people. (Valentine Aff., Exh. E at 38; Pl.'s Mem. at 6; Plaintiff's Counter Statement Pursuant to

1. Sitting by designation.

2. Excerpts from the plaintiff's deposition, conducted on October 17, 1997, November 7, 1997 and November 13, 1997, are attached to

Valentine's Affidavit in Support of his Opposition to Defendant's Motion for Summary Judgment and to the Affidavit of Lawrence Peikes in Support of Defendant's Motion for Summary Judgment at Tab 1.

Local Rule 3(g) ("Pl.'s 56.1") ¶ 1; Defendant's Local Rule 56.1 Statement ("Def.'s 56.1") ¶ 1.) Plaintiff was hired about forty-five days after being released from a mental hospital where he was treated upon suffering his second "nervous breakdown" in less than two years. (Plaintiff's First Amended Complaint ("1st Am.Compl.") ¶ 8 at 1.) Plaintiff alleges that although he continued to grapple with severe anxiety problems and suffered from recurring manic-depressive mood swings requiring medication, he prospered at S & P. (Pl.'s Mem. at 6.) By September 26, 1983, S & P promoted plaintiff to an Analyst position. (Valentine Aff., Exh. E at 38.) In the mid–1980s, plaintiff regularly received high marks for his analytical abilities from the editors of S & P's publications [3] and was highly ranked in the editors' periodic rankings of analysts. (Pl.'s Mem. at 3, 6.) In April 1984, plaintiff was ranked sixth out of twenty analysts in his department and, by August 1984, he was ranked first out of eighteen analysts by all of the editors in his department. (Valentine Aff., Exh. E at 7, 38; Pl.'s Mem. at 3, 6.)

In September 1985, however, plaintiff abruptly quit his job in the midst of a manic mood swing. (Pl.'s Mem. at 6; Pl.'s Dep. at 429.) Convinced to return to S & P by Steve Sanborn, the Senior Vice President in charge of his department, plaintiff resumed work almost immediately and was promoted to Senior Analyst three months later. (Pl.'s Mem. at 6–7.) Upon his return, plaintiff assumed responsibility for the tracking and analysis of approximately forty electronic stocks and six or seven toy stocks. (Pl.'s Dep. at 314, 453–54; Affidavit of Robert Temme in Support of Defendant's Motion for Summary Judgment ("Temme Aff.") ¶ 2.) Plaintiff's duties included preparing written reports and analyses of these stocks for S & P publications distributed to brokers, investors and securities firms. (Temme Aff. ¶ 2.)

In November 1985, plaintiff was still ranked first out of eighteen analysts, (Valentine Aff., Exh. E at 7.), however, his performance soon began to decline. (Pl.'s Mem. at 7.) Plaintiff was ranked sixth out of nineteen analysts in May 1986, and dropped to eleventh out of twenty analysts by November of that year. Rebounding slightly in 1987, plaintiff was ranked eighth out of nineteen analysts in May and eighth out of twenty analysts in November. (Valentine Aff., Exh. E at 7.) Plaintiff's ranking further plummeted between 1988 and 1990, following a string of personal tragedies which included the death of his mother, grandmother and sister. (Pl.'s Mem. at 7; Pl.'s Dep. at 432–34.) In June 1988, plaintiff was ranked twentieth out of twenty-two analysts and by July 1989, he had slipped to twenty-first. (Valentine Aff., Exh. E at 39.) Ranked eighteenth in July 1990, plaintiff felt that management had failed to sufficiently sympathize with his tragedies and instead used them as "excuses to give [him] viciously biased reviews." (Valentine Aff., Exh. E at 39; Pl.'s Mem. at 7.) Plaintiff initially "began to suspect that [his] reviews were biased ... because word of [his] homosexual sex life had found its way into the office." (Pl.'s Mem. at 7.)

Plaintiff alleges that S & P's discrimination against him because of his mental illness began in July 1990, after *Fortune* magazine published plaintiff's letter to the editor disclosing that he was "a lithium-maintained manic-depressive." (Plaintiff's Second Amended Complaint ("2d Am. Compl.") ¶ 8; Valentine Aff., Exh. E at 3.) Until that time, plaintiff had not disclosed to S & P's management that he had been diagnosed as manic-depressive. (Pl.'s 56.1 ¶ 2; Def.'s 56.1 ¶ 2.) Although the record is unclear as to how S & P first became aware of the published letter, plaintiff claims that he "had the approval of Steve Sanborn to send the letter." (Pl.'s Dep. at 439.) [4] Plaintiff contends that S & P's

---

**3.** S & P's publications and electronic services, which provided stock information to brokers, investors and securities firms, included *Industry Surveys, Stock Reports, Outlook* and *Marketscope.* (Temme Aff. ¶¶ 7, 10, 12.)

**4.** Plaintiff claims that he first informed Sanborn of his mental illness in September 1985 when plaintiff abruptly quit his job and then returned to S & P. (Pl.'s Dep. at 429–30.)

discrimination manifested itself in adverse measures taken against him soon after the public disclosure of his mental illness. (2d Am.Compl.¶ 8.) For instance, in October 1990, David Blitzer, plaintiff's manager, objected to plaintiff's attempts to appear on *Wall Street Week*, a top rated business program. (Pl.'s Mem. at 4, 8.) Plaintiff postulates that Blitzer objected to his appearance on the show because S & P did not want a manic-depressive to represent the company publicly. (*Id.*) S & P's alleged discriminatory conduct against plaintiff continued in the form of negative performance evaluations. (2d Am.Compl.¶ 8.) *See* discussion of plaintiff's allegations concerning his performance history at S & P, *infra* at pp. 269 – 276.

S & P's review process of each analyst's performance consisted of evaluations and compiled rankings by the editors of S & P's various publications. (Pl.'s Dep. at 430, 432; Affidavit of Robert Natale in Support of Defendant's Motion for Summary Judgment ("Natale Aff.") ¶ 4.) In early 1991, plaintiff received a critical written evaluation which dropped his ranking at S & P. (Pl.'s Mem. at 8; Valentine Aff., Exh. E at 61–62.) He was also given a "verbal warning of disciplinary action". (*Id.*) Plaintiff believes that the review reflected a clear intent to discriminate against him because of his manic-depression and marked the beginning of efforts by S & P's management to terminate his employment on the basis of his disability. (Pl.'s Mem. at 8–9.) Plaintiff's next evaluation, in the summer of 1991, was again negative. (*Id.* at 9.) Robert Natale, plaintiff's new manager, reiterated the earlier verbal warning and advised plaintiff that his performance must improve or further disciplinary action could eventually lead to the termination of his employment. (Valentine Aff., Exh. E at 15.) Natale also told plaintiff that if his poor performance was a result of his illness, "perhaps a doctor would disable [him]". (*Id.* at 16) Plaintiff believes that Natale's comments

illustrated S & P's initial attempt to place him involuntarily on disability. (2d Am. Compl. ¶ 8; Pl.'s Mem. at 9.)

In his review in the summer of 1992, plaintiff's ranking improved. Yet, although plaintiff was a widely quoted analyst (Pl.'s Dep. at 511; Valentine Aff., Exh. B), he was criticized for "impressions created outside the department". (Pl.'s Mem. at 9–10.) In September 1992, plaintiff filed a formal grievance with his union, the Newspaper Guild ("the Guild"), alleging that he had been subjected to discriminatory treatment on the basis of his sexual orientation. (Def.'s 56.1 ¶ 3.) Although he attributed the discriminatory conduct to his sexual orientation, plaintiff also alluded to Natale's comment, about going on disability, as discrimination on the basis of his mental illness. (Valentine Aff., Exh. E at 13.) After investigating plaintiff's grievance, Robert Temme, S & P's Director of Human Resources, concluded, in an interoffice memorandum dated January 15, 1993, that there was no merit to plaintiff's allegations. (Valentine Aff., Exh. E at 14–16; Temme's Aff. ¶¶ 5–9.)

In September 1994, plaintiff received another critical evaluation and verbal warning. (2d Am.Compl. ¶ 8; Pl.'s 56.1 ¶ 5; Pl.'s Dep. at 648–49; Valentine Exh. 23.[5]) He subsequently filed several grievances with the Guild concerning his review and the perceived discrimination. (Pl.'s 56.1 ¶ 5; Valentine Aff., Exh. E at 64–70, 79, 104–109; Valentine Exh. 23.) By inter-office memorandum dated December 22, 1994, Temme denied plaintiff's grievance of discrimination, determining that the evaluation and disciplinary action were justified by legitimate concerns relating to plaintiff's performance of his responsibilities. (Pl.'s 56.1 ¶ 5; Def.'s 56.1 ¶ 5; Pl.'s Dep. at 692; Valentine Aff., Exh. E at 79.)

During Temme's investigation of plaintiff's grievance, plaintiff distributed an excerpt from a book he was writing to sever-

---

**5.** Attached to the Affidavit of Lawrence Peikes at Tab 3 are documents introduced as exhibits to the deposition of plaintiff.

al colleagues in his department. (Pl.'s 56.1 ¶ 6; Def.'s 56.1 ¶ 6.) In the excerpt, plaintiff described incidents of alleged sexual harassment and homosexual advances by Natale. Plaintiff's stated objective in distributing the excerpt was to generate leverage in support of his disability discrimination grievance and to embarrass and humiliate Natale in the eyes of his subordinates. (Pl.'s 56.1 ¶ 6; Def.'s 56.1 ¶ 6; Pl.'s Dep. at 284–92, 303–23; Valentine Exh. 2.) In the December 22, 1994 memorandum dismissing plaintiff's charges of disability discrimination, Temme issued the following warning to plaintiff: "I would point out that unfounded allegations concerning the character of an individual's supervisor, if made to fellow employees or otherwise publicly disseminated, may be the basis for independent discipline by Standard & Poor's." (Pl.'s 56.1 ¶ 7; Valentine Aff., Exh. E at 79.)

On April 10, 1995, S & P informed plaintiff that he was being placed, along with another analyst, in a pilot "stop-loss" program. (2d Am.Compl. ¶ 8; Valentine Exh. 32.) The stop-loss system was designed to change automatically an analyst's rating for a stock if that stock's performance changed. (Valentine Aff., Exh. E at 21; Valentine Exh. 32.) Specifically, for any stock that moved significantly in the direction opposite than that of the analyst's recommendation—e.g. a highly recommended stock that fell more than ten percent—the analyst's recommendation was overridden for thirty days. (Valentine Aff., Exh. E at 21.) S & P's stated reason at the time for placing plaintiff in the stop-loss program was that he covered volatile industries and that during the first half of 1995, he had refused to recommend certain semiconductor stocks that were performing strongly and had been rated favorably by other Wall Street analysts. (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8; Natale Aff. ¶¶ 10–11; Temme Aff. ¶ 14.) Plaintiff's failure to recommend these stocks for purchase prompted a series of complaints from at least one portfolio manager, who wanted to purchase the stocks, but was precluded from doing so because Valentine had not recommended them. (*Id.*) On May 9, 1995, after the stop-loss system was implemented, the Guild filed a grievance alleging that plaintiff had been singled out for inclusion in the "stop-loss" program. (Pl.'s 56.1 ¶ 9; Def.'s 56.1 ¶ 9; Valentine Exh. 33.)

On June 20, 1995, S & P removed plaintiff from covering semiconductor stocks. (2d Am.Compl. ¶ 8.) In addition, S & P diminished plaintiff's analytical and stock picking functions and assigned him new responsibilities of a more factual nature— condensing earning statements and issuing press releases and annual reports. (Pl.'s Mem. at 13; Natale Aff. ¶ 13.) Plaintiff's salary, however, remained unchanged. (Pl.'s Dep. at 745.) On August 1, 1995, plaintiff was issued a written warning for unsatisfactory job performance and during his review on August 30, 1995, plaintiff was informed that his performance was "dismal" and that he had received the worst review in the history of his department. (Pl.'s Mem. at 14; Valentine Exh. 38.) Based on these activities, plaintiff filed a charge of disability discrimination with the EEOC on September 7, 1995. (Valentine Aff., Exh. E at 101–103.)

In mid-October 1995, several of plaintiff's co-workers made complaints about plaintiff's behavior and expressed concerns about his overall mental well-being. (Pl.'s 56.1 ¶ 12; Def.'s 56.1 ¶ 12.) Two analysts reported that plaintiff regularly paced back and forth in the halls and frequently slammed his door. Another co-worker told Natale that plaintiff continually referred to a book that he was writing about a government conspiracy against him. (*Id.*) On October 16, 1995,[6] Temme, Natale, and John Coyle, plaintiff's immediate supervisor, met to discuss plaintiff's behavior. At the meeting, Temme asked plaintiff about his health and stated that

---

**6.** Plaintiff's exhibits include a memorandum to file by Natale suggesting that this meeting may have taken place on September 16, 1995.

The precise date of this meeting, however, is not material, because there is no dispute as to what occurred. (Valentine Aff., Exh. E at 95.)

plaintiff had the option of using the Employee Assistance Program. (Pl.'s Mem. at 14; Valentine Aff., Exh. E at 95; Pl.'s Dep. at 769.) Plaintiff replied that he was already seeing a psychiatrist and that his co-workers were making these complaints because they resented him for his sexual orientation. (Pl.'s Dep. at 399–400, 769.) Several days later, S & P requested that plaintiff provide a letter from his psychiatrist confirming his ability to perform his job duties. (Pl.'s 56.1 ¶ 13; Def.'s 56.1 ¶ 13.)

Plaintiff sought from his psychiatrist, Dr. Bruce Braverman, a letter affirming his fitness for work. (Bruce Braverman's Deposition [7] ("Braverman Dep") at 74–75.) On October 19, 1995, Dr. Braverman sent a letter to S & P stating simply that plaintiff was "fully able to perform all of his job functions and responsibilities." (Valentine Exh. 46.) This statement was based solely on Dr. Braverman's assessment of plaintiff's intellectual capacity and cognitive functioning. (Braverman Dep. at 76–77.) After sending this letter, Dr. Braverman was contacted by Dr. Barbara Nichols from McGraw–Hill on October 25, 1995. (Id. at 81–82.) Dr. Nichols provided Dr. Braverman with information about plaintiff's conduct at work, and asked him, in light of this information, to assess whether plaintiff might require disability leave. (Id. at 84–85.) When Dr. Braverman later discussed this conversation with plaintiff, plaintiff informed the doctor that he did not want to consider disability leave, and did not want Dr. Braverman to discuss that option with S & P. (Id. at 86–91.)

On October 26, 1995, plaintiff left the following voice mail message for a co-worker who had recently accepted a position with another investment company, one Doe Company: [8]

My name is Paul Valentine. Actually I do want to say not only have they [signaled] me that you were in on the cover-up and are an alcoholic, they also tell me that you're a fruit and that you really go around to gay clubs, and that you're really a total fag but, you know, you don't have to worry about me spreading the truth around the office. You'll be a[t] [the Doe Company]; Wall Street, you know, is not a small place. You know, stories like that don't get around. Your identity is totally safe and don't worry, of course I have nothing to base that on. Bye bye.

(Pl.'s 56.1 ¶ 15; Def's 56.1 ¶ 15.) The co-worker who received this voice mail message forwarded it to Natale, who in turn gave it to Temme. On October 27, 1995, plaintiff was called into a meeting with Temme and a union representative. (Pl.'s 56.1 ¶ 16; Def.'s 56.1 ¶ 16; Pl.'s Mem. at 17–18.) During the course of this meeting, plaintiff admitted that the voice mail message was threatening in nature and that he had previously been warned about threatening another employee's reputation. (Pl.'s 56.1 ¶ 16; Def.'s 56.1 ¶ 16.) At the end of the meeting, plaintiff was suspended with pay. (Pl.'s 56.1 ¶ 17; Pl.'s Mem. at 19.)

On October 31, 1995, S & P notified plaintiff that he was terminated. (Valentine Exh. 47.) S & P's stated reason for plaintiff's termination was plaintiff's gross misconduct in leaving the threatening voice mail message to his colleague. (Id.)

## II. Plaintiff's Allegations of Discrimination

### A. Plaintiff's Performance History at S & P

Despite plaintiff's admission that his performance deteriorated from 1988 through 1990, plaintiff began to suspect a

7. The full deposition of Dr. Bruce Braverman conducted on April 9, 1998, is attached as Exhibit D to Valentine's Affidavit in Support of his Opposition to Defendant's Motion for Summary Judgment. Excerpts from the same deposition are attached to the Affidavit of Lawrence Peikes in Support of Defendant's Motion for Summary Judgment at Tab 2.

8. To protect the privacy of the co-worker, who is not a party to this action, a pseudonym is used for the investment company which hired the co-worker.

discriminatory animus behind his poor performance reviews in the late 1980s. (Pl.'s Mem. at 7.) Plaintiff first attributed his poor reviews to discrimination based on his sexual orientation, claiming that his S & P department had become aware of his "open and flamboyant homosexual life style" in 1988. (Pl.'s Mem. at 7; Pl.'s Dep. at 363–68.) Soon thereafter, plaintiff claims he became subjected to "cracks and innuendos" on a daily basis. (Pl.'s Mem. at 7.) Thus, when his ranking dropped from eighth in 1987 to twentieth in 1988, plaintiff suspected that the cause was S & P's awareness of his homosexuality. (*Id.*) Plaintiff admits, however, that no one at S & P ever discussed his homosexual lifestyle with him. (Pl.'s Dep. at 365–66.) Further, plaintiff admits he suffered severe trauma from the various family deaths occurring during this time frame.[9] (*See* Pl.'s Mem. at 7; Pl.'s Dep. at 432–34.)

As plaintiff's poor performance reviews continued following the July 1990 publication of his letter revealing that he was manic-depressive, plaintiff began to suspect that the motivation for S & P's discrimination had shifted from his sexual orientation to his mental illness. (Pl.'s Dep. at 658–59.) Plaintiff states that:

> I felt that while the numbers had indicated I had begun to make some progress about whatever discrimination I faced because of the sexual orientation, that the discrimination continued, and I thought it was primarily because of that letter to *Fortune,* and I got comments directly or indirectly from management about that letter from *Fortune.*

(*Id.* at 659.) Plaintiff claims that his poor performance review covering the second half of 1990 "made [him] decide that the dynamic now largely driving the discrimi-

nation that [he] was facing was not due primarily to [his] homosexual sexual orientation but was caused by [his] mental illness, which had become known in the department." (1st Am.Compl. ¶ 8 at 3.)

### 1. *February 1991 Review*

Plaintiff alleges that in his February 1991 oral review, covering the second half of 1990, Blitzer gave him a verbal warning and informed him that his performance was unacceptable and that he would receive a written warning[10] that could lead to his dismissal in three months. (Pl.'s Mem. at 8; Valentine Exh. 8.) Plaintiff's ranking had dropped from eighteenth in July 1990 to twenty-third in January 1991. (Pl.'s Mem. at 8; Valentine Aff., Exh E at 61–62.) At his February 1991 review, plaintiff was criticized for his work on *Stock Reports,* particularly with regard to stock recommendations in the latter part of 1990 which had not done well. (Pl.'s Dep. at 498–500.) Plaintiff notes that his stock performance had improved for the first few weeks of 1991, prior to the February review with Blitzer, but after the end of the time period covered by the review. (*Id.*) Plaintiff claims that the review made no sense to him given that the strain of his family tragedies had subsided and that he had made every effort to improve his performance. (1st Am.Compl. ¶ 8 at 4; Pl.'s Mem. at 8.) The written review reflected plaintiff's disappointment over the poor evaluation and that "he would fight any dismissal with union support." (Valentine Aff., Exh. E at 61.) Interpreting Blitzer's threat of a written warning as a clear intent to fire him, plaintiff went to the Guild and successfully averted the threatened written warning by expressing the extent of his trauma and grief over his recent family tragedies. (1st Am.Compl.

---

**9.** Plaintiff's mother died in 1987 and "the addition of the dea[th] of [his] grandmother the following summer and the disappearance of [his] sister in March 1989 while traveling in Sri Lanka on her round-the-world trip added to the trauma that [he] was experiencing." Pl.'s Mem. at 7 (citing Valentine Aff., Exh. E at 40–57). Moreover, plaintiff alleges that in August 1990 he was informed by the Sri Lan-

kan government that his sister "had been murdered by a serial killer." *Id.*

**10.** A written warning is the first step toward being discharged for poor performance under the terms of the Guild's collective bargaining agreement with S & P. (Pl.'s Dep. at 501–02; 550–51.)

¶ 8 at 5; Pl.'s Mem. at 9; Pl.'s Dep. at 500–02.) .

### 2. *Summer of 1991 Review*

Plaintiff alleges that his review in the summer of 1991, covering the first half of 1991, was also discriminatory. Natale, plaintiff's new research director, reiterated the prior verbal warning and informed plaintiff that his performance remained unsatisfactory and advised him that unless his performance improved further disciplinary action might be taken, including the issuance of a written warning that could lead to plaintiff's dismissal in six months. (Pl.'s Mem. at 9; Pl.'s Dep. at 592.) According to plaintiff, Natale also told him he should go on disability, which he took as an indication that Natale considered him an unfit employee because of his mental illness. (Pl.'s Mem. at 9; Valentine Aff., Exh. E at 13.) Plaintiff rated his own performance as satisfactory and felt there was a clear intent on the part of S & P's management to force him out of his job because of his disability. Although, plaintiff concedes that his work had deteriorated earlier on, he claims that he had fully recovered by this time. (1st Am. Compl. ¶ 8 at 5.) Plaintiff contacted Dave Mulcahy, the head of the Guild, and expressed his opinion that he was being discriminated against based on his mental illness and once again successfully averted the issuance of a written warning. (Pl.'s Mem. at 9.)

### 3. *Summer of 1992 Review*

In the summer of 1992, plaintiff claims he was given another discriminatory review. Although plaintiff was told at his oral review that his work habits, attitude, hours and writing had improved, along with his ranking, (Pl.'s Dep. at 506–510.), plaintiff took exception to his written review, which indicated that he needed improvement in two out of eighteen categories: "[a]cceptance of con-

structive criticism" and "[i]mpressions created outside the department." (Valentine Aff., Exh. E at 63, 68.) Plaintiff was particularly upset with the criticism that he needed to improve "impressions created outside the department." (Pl.'s Mem. at 9; Pl.'s Dep. at 510–13.) Plaintiff unabashedly claims that at that time, "[n]ot only was [he] the most widely interviewed analyst in the media from the department, [h]e was one of the best dressed." (1st. Am.Compl. ¶ 8 at 6.) Plaintiff further states:

> [n]ow [the review] struck me as highly discriminatory, because I was generating valuable publicity for Standard & Poor's in newspapers, in magazines, on television and radio. And here I'm being told that my impressions rated throughout—outside the department, were not favorable, and I felt this was prima facie evidence they were taking into account my stories about my personal life that were flying throughout the department, and that's why that box is checked that way.

(Pl.'s Dep. at 511.) Thus, the comment that he needed improvement in "impressions created outside the department" confirmed plaintiff's belief that the rest of the review was "grossly biased" and discriminated against him primarily based on his sexual orientation, rather than based on his work habits or hours. (1st. Am.Compl. ¶ 8 at 6; Pl.'s Dep. at 512–13.) Although plaintiff also claims that the review reflected discrimination against him based on his manic-depression. (1st. Am.Compl. ¶ 8 at 6), he admits to a belief that S & P gave him the unfavorable rating concerning impressions outside the department because of his homosexuality, not his mental illness. (Pl.'s Dep. at 513.)

On September 15, 1992, in response to his poor review, plaintiff sent a grievance to Mulcahy, alleging harassment and discrimination based on his sexual orientation.[11] In the grievance, plaintiff de-

---

11. Plaintiff explains that although the review discriminated against him on the basis of both his sexual orientation and mental illness, he chose formally to pursue only the sexual orientation claim. Plaintiff alleges that after his review, he met with several union officials

scribed the discrimination he perceived from John Watson, an editor who did his review for *Stock Reports,* and from editors at *Marketscope.* (Valentine Aff.Exh. E at 8–13; Pl.'s Dep. at 535.) Plaintiff asserted that Watson had been discriminating against him over the past few years by giving him poor reviews and ranking him either last or close to last in the department. Plaintiff claimed that in 1992, two and a half years after his family tragedies, his work had improved dramatically. Harking back to his previous stellar standing in the department, plaintiff stated:

> I used to be the #1 ranked analyst in this department. And even more impressive, I used to be ranked #1 by the editor of every service. If I am no longer burdened with those profound problems our family suffered and am giving 100% to improving my reviews, why haven't my reviews improved dramatically? I maintain the reason the improvement in my reviews has been far short of dramatic is because I am being discriminated against because of my sexual orientation. It is interesting to note that when I was ranked #1 in the department by EVERY editor, everyone thought I was a heterosexual.

(Valentine's Aff., Exh. E at 9.) Plaintiff also discussed the review from. Watson, alleging that Watson's actions clearly revealed him to be a "homophobic [who] hates homosexuals." (*Id.*) Two years earlier, Watson had identified two problems with plaintiff's work: (1) that he was late; and (2) sloppy. Plaintiff claimed he had substantially solved both problems, but his reviews had not similarly improved. Plaintiff noted that back in 1985, Watson had ranked him as the number one analyst for *Stock Reports* and, thus, plaintiff attributed his lower ranking to discrimination on the basis of his sexual orientation. (*Id.* at 9–10.) Plaintiff, however, now admits that he had no factual basis for believing that Watson knew of his sexual orientation. (Pl.'s Dep. at 583.)

Plaintiff's September 15, 1992 grievance also claimed that *Marketscope,* and particularly its executive editor, Walt Arvin, had discriminated against him in his reviews because of his homosexuality. (Valentine Aff., Exh. E at 10.) Plaintiff alleged that the staff of Marketscope had harassed him continuously by making comments which he perceived as innuendos concerning his sexuality. In particular, plaintiff alleged that a staff member of *Marketscope* regularly ridiculed him by telling openly gay jokes about cabbage patch dolls and that Arvin once passed him in the hallway without saying hello, only to say to another colleague, in a loud voice, "[t]he reason I didn't say hello to him was that I didn't want to get fucked in the middle of the afternoon." (*Id.*) Plaintiff's belief that Arvin was referring to him was "reinforced by [Arvin's] guilty look and fast exit once he saw [plaintiff] had overheard him." Thus, given this ongoing harassment, plaintiff claims it was reasonable for him to conclude that his poor performance reviews and the failure to select him as the *Marketscope* contributor of the month when he was one of its leading contributors, reflected discrimination on the basis of his sexual orientation. (*Id.*)

In his grievance, plaintiff also objected to a prior review by Natale back in 1989. He claimed that Natale "mocked [him] derisively by yelling at [him], '[m]ost computer analysts know more about the semiconductor industry than you.'" (Valentine Aff., Exh. E at 11.) Plaintiff believed that Natale's bias against him stemmed from Natale's resentment "that [plaintiff] was out of the closet and he was in the closet." (Pl.'s Dep. at 542–43.) According to plaintiff. Natale "was living a life in the closet," and was resentful because plaintiff had previously rebuffed his sexual advances

---

including Donna Flower, the attorney for his local guild. He claims that Flower informed him that charging S & P with discrimination on the basis of his mental illness would be a "dead end" because the ADA had not yet been tested in court. (1st Am. Compl. ¶ 8 at 5; Pl.'s Dep. at 554–55.) In addition, plaintiff was not certain that the ADA, which became effective in July 1992, covered the six month review period, ending on June 30, 1992.

and had disclosed these alleged indiscretions. (*Id.*)

After discussing a litany of other disparaging comments made by various S & P employees, plaintiff's grievance described Blitzer's reaction to the publication of his letter in *Fortune.* Plaintiff claimed that in the fall of 1990, Blitzer, his then research director, "went bizzerk [sic] about the letter that I had sent to *Fortune* in the middle of the main public hallway on the 17th floor. He proceeded to threaten to take the toy group away from me and told me to stop trying to get on *Wall Street Week,* which efforts Steve Sanborn was aware of and supported."[12] (Valentine Aff., Exh. E at 11–12.) Plaintiff complained to Sanborn about Blitzer at that time. Plaintiff concluded his grievance with the observation that the ADA did not go into effect until July 26, 1992, after Blitzer's acts occurred. However, plaintiff warned that if in the future he felt he was being discriminated against on the basis of his manic-depression, he would raise his claims under the ADA. (*Id.* at 13.)

On January 15, 1993, Temme responded to plaintiff's grievance. Plaintiff believes that this response was itself discriminatory because Temme failed to deal directly with his objections. Plaintiff also believes the response reflected management's objection to his sexual orientation and their discomfort with his public disclosure of his manic-depression. (1st: Am. Compl. ¶ 8 at 10.) Plaintiff points to management's comments in the response as an indication of S & P's initial concern about his mental illness:

[i]n your letter which was published in July of 1990, you objected to *Fortune*'s "gratuitous treatment of someone's treatment of mental illness." You volunteered that you yourself were manic depressive. Because you were identified as an analyst for Standard and Poor's, the company was concerned how our clients would react. Thus, David Blitzer, research director for the Analytical Department, reviewed this matter and concluded that no action was warranted.

(Valentine Aff., Exh. E at 15.) Although plaintiff views S & P's stated concerns about its clients' reaction as discriminatory, he does admit that it was a "legitimate" concern based on the public's misperceptions of the mentally ill. (Pl.'s Dep. at 553.)

Plaintiff also took exception to Temme's reference to his attendance. (Pl.'s Mem. at 10.) In the memorandum, Temme stated that S & P's managers had made every effort to accommodate plaintiff, particularly when plaintiff was absent from work for a week in December 1990 without any prior notice. (Valentine Aff., Exh. E at 16.) Plaintiff claims that he took the week off because of another manic mood swing, and interprets the reference to his absenteeism as discrimination, believing that it reflected S & P's antagonism towards his manic-depression. (1st. Am. Compl. ¶ 8 at 10–11; Pl.'s Mem. at 10.) Plaintiff alleges that he decided not to pursue charges of discrimination, however, because after writing two memoranda contesting Temme's response, (Valentine Aff., Exh. E. at 17–19), Temme begged him not to go to the New York City Human Rights Department and assured him that there would be

---

12. Plaintiff submits three letters from Rich Dubroff, the producer of *Wall Street Week With Louis Rukeyser,* dated October 25, 1989, April 24, 1990 and October 3, 1990. (Valentine Aff., Exh. E at 58–60.) The October 25, 1989 letter thanked plaintiff for his note dated October 18, and stated that although the producer was not interested in producing a program on toy stocks that year, plaintiff should contact him again next year in September. The April 24, 1990 letter thanked plaintiff for sending a tape and stated that although the producer was unlikely to produce a program about toys for at least six months, plaintiff should stay in touch. Finally, the letter dated October 3, 1990 thanked plaintiff for his letter dated September 26 and stated "[d]ue to the uncertain economic climate this year, we have decided to produce a program on the entire retailing industry, instead of just focusing on the toy industry, but I appreciate your continuing interest and enthusiasm, and hope you'll keep in touch in hopes of appearing on the program, perhaps in the Fall of 1991." (*Id.*)

no future discrimination. (Pl.'s Mem. at 10; 1st. Am. Compl. at 11.)

### 4. *September 6, 1994 Review*

Plaintiff maintains, however, that despite Temme's promise, he was again discriminated against in his performance review for the first half of 1994. In August 1994, prior to his review, plaintiff was given a verbal warning regarding his unsatisfactory job performance. (Valentine Aff., Exh. E at 79.) He was issued the warning because two major services, *Outlook* and *Industry Surveys,* found his work unacceptable. (*Id.*) The verbal warning was followed by a formal review on September 6, 1994, with Natale and Susan Stahl Gibney, plaintiff's investment officer. Natale reiterated the verbal warning and advised plaintiff that continued unsatisfactory performance could result in his dismissal in forty-five days. (Valentine Aff., Exh. E at 64.) Plaintiff took exception to this review because over the years he had received numerous letters of praise for his contributions to *Industry Surveys.* Plaintiff further claims that he was the number one stock picker for *Outlook.* (Pl.'s Mem. at 11; Valentine Aff., Exh. E at 66–67.) As plaintiff explains:

> I just thought the review was out of, out of context with the quality of work I had been producing, and I felt a review, especially from Industry Surveys, was biased against me; that these were surveys that I was receiving compliments from executives in the industry . . . . and I thought the Outlook review continued to be biased against me; that they continued to cite stock recommendations made outside the review period, and I didn't think I was given a chance there. . . . The MarketScope recommendation, I can't remember at the time, sitting here, what that was; but I obviously felt that the review overall was discriminatory.

(Pl.'s Dep. at 646–47.) Thus, although plaintiff was one of four employees who received unsatisfactory work performance reviews by at least two of the services, plaintiff perceived that his review and

warning were motivated by his manic-depression. (Valentine Aff., Exh. E at 105.) Plaintiff believes that Natale's reference, during his review, to the letter to *Fortune* as a full blown "article" was further evidence of S & P's discriminatory animus. (Pl.'s Mem. at 11.)

Plaintiff's written evaluation covering the period from June 1993 through June 1994, revealed that he needed improvement in nineteen out of twenty categories. (Valentine Aff., Exh. E at 78.) The review further indicated that plaintiff's performance had deteriorated since his last evaluation in every category except "[i]mpressions created outside department." (*Id.*) Plaintiff objected to this review, particularly the written comment under the section of "Job Knowledge" that he "[n]eeds to work with WriterStation, Lotus, Comstock and Word Processing." (*Id.*) Plaintiff believes that this comment was gratuitous and illustrated "gross discrimination" since he worked with WriterStation and Word-Processing on a daily basis. (Pl.'s Mem. at 11.) Plaintiff even perceived his improved review in the category of "impressions created outside the department" as prima facie evidence of discrimination. He alleges that he was found acceptable in that category only because Natale "was reacting to previous discrimination charges on [his] part, and that [Natale] only checked that box as a reaction to protect him from being charged with additional discrimination based on that issue, and ranking that acceptable to me was prima facie evidence he had discriminated against me in the first place." (Pl.'s Dep. at 647.) Plaintiff was ranked fourteenth out of twenty-five analysts in July 1993, but dropped to twenty-first out of twenty-three analysts by December 1993. (Valentine Aff., Exh. E at 99, 108.) Given this decline in ranking, plaintiff explains his belief that S & P was discriminating against him as follows:

> [t]he basis for that belief is I was being given reviews which I thought were discriminatory, and that I was consistently given these reviews regardless of the changes in the quality of the work I

produced, and it led me to believe that there was a systematic pattern of discrimination contained in these reviews. (Pl.'s Dep. at 656.)

Plaintiff responded to his September 1994 review by submitting another grievance to the Guild. In a memorandum to Mulcahy, dated September 7, 1994, plaintiff alleged that he had become the "object of a dismissal action" because he was "manic/depressive and management does not believe a manic/depressive should hold the job of an analyst at Standard and Poor's." (Valentine Exhibit 23 at 1.) Plaintiff then described his interactions with various individuals since the disclosure of his illness in the letter to *Fortune*. He revealed that the first person to take exception to the letter was Martin Skala, a senior editor of *Outlook* at that time. Plaintiff stated that Skala "violently objected to the letter and told [plaintiff] that he was surprised they would even publish it" considering the letter objected to a story written by one of *Fortune's* top reporters. Plaintiff believed that Skala's statement endorsed the articles's "disparaging comments about mental illness." (*Id.*) Plaintiff then, once again, related Blitzer's reaction to the article as discriminatory and stated his perception that S & P became more "embittered" toward him once his history of mental illness became common knowledge. Plaintiff explained:

I believe the management of Standard and Poor's has passed word throughout the department that I am an unacceptable employee because of my mental illness. This has resulted in systematic discrimination against me by the editors that has resulted in my rankings slipping so far that I am now facing warnings and possible dismissal.

(Valentine Exh. 23 at 2.) Plaintiff then detailed the particulars of the September 6, 1994 review which he felt was discriminatory.

Plaintiff attributed his poor *Industry Surveys'* evaluation to a conflict of personalities with the editor, Ralph Hockens, and Hockens' hostility to plaintiff's mental ill-

ness. (*Id.* at 2–4.) Plaintiff also claimed that another editor, Eileen Martines, was "uniformly critical of [his] work because she understands that the management of this company does not believe that a manic depressive should have the job of analyst at Standard & Poor's." (*Id.* at 4.) Plaintiff further imputed his poor *Outlook* reviews to discrimination, alleging the following:

I believe that Martin Skala's attitude toward my mental illness reflects the thinking of the entire Outlook staff. They are offended by my mental illness and do not believe a manic/depressive should have the job of analyst at Standard & Poor's. They constantly refer in their comments about my work to poor stock recommendations made on Intel and Westinghouse that occurred years ago. Robert repeated these comments in all of my recent reviews even though he is aware that reviews are supposed to only cover the previous six months. They have also begun going behind my back to Robert about earning estimates and the style of recommendations in an effort to discredit me as a mentally ill person.

(Valentine Exh. 23 at 4.) Plaintiff readily admits that his perception of discrimination arose out of his disagreement with the way the service was rating and ranking him. (Pl.'s Dep. at 666.)

Plaintiff also attributed his poor performance reviews from *Marketscope* to discrimination. Plaintiff took exception to David Braverman's criticism of his writing, noting that a colleague who frequently edited his stories repeatedly told him that they were well written and often did not require any changes. (Valentine Exh. 23 at 5.) Plaintiff further stated that he even contacted Braverman at times to point out "broken English and the absence of an investment rationale in other analyst's [sic] stories." (*Id.*) Thus, despite plaintiff's admission that he was late with stories to *Marketscope* detailing significant developments about companies he was covering, plaintiff believed that the criticism of his

work was purely discriminatory. (Pl.'s Dep. at 680.)

In the course of investigating plaintiff's allegations, Temme responded by inter-office memorandum, dated November 8, 1994, to the Guild's request for information. (Valentine Aff., Exh. E at 20.) In his memorandum, Temme stated that he had been advised by Natale that plaintiff's job performance had not improved since the verbal warning and that plaintiff had recently failed to meet deadlines for submitting stories to *Marketscope*. (Valentine Aff., Exh. E at 20; Natale Aff. ¶ 9.) Temme also suggested that the Guild "may want to advise Paul that he contract [sic] the Employee Assistan[ce] Program who would assist Paul in providing determination of a disability and suggest a treatment program." (Valentine Aff., Exh. E at 20.) Finally, Temme stated that he had recommended to Natale that they wait until they "establish that Paul in fact had a disability which prevents him from performing an essential function of his job responsibilities" before taking further disciplinary action. (Valentine Aff., Exh. E at 20.)

By inter-office memorandum dated December 22, 1994, Temme dismissed plaintiff's charges of discrimination. (Valentine Aff., Exh. E at 79.) Temme determined that plaintiff's charges of discrimination based on his mental illness and his sexual orientation were without merit, noting that most of the individuals charged with sexual orientation bias were not even aware that plaintiff was a homosexual.

### 5. *August 30, 1995 Review*

Plaintiff claims that his final review at S & P with Natale and John Coyle, on August 30, 1995, was also discriminatory. This review, covering the period from January 1, 1995 to June 30, 1995, was preceded by a written warning on August 1, 1995. (Valentine Exh. 38.) The warning letter noted that plaintiff was given verbal warnings in both May and June regarding a significant number of late stock reports. In addition, it stated that "[a]s a result of a complaint from the manager of the S & P Stars Portfolio, you have been assigned to

new responsibilities in the factual area," which would require plaintiff to complete twenty-five stock reports by October 1, 1995. (*Id.*) Finally, the letter concluded with this warning:

> [i]n view of the above, please be advised that you are being warned for unsatisfactory job performance. You must bring your performance to a satisfactory level of performance in a reasonable period time [sic] and thereafter maintain it as such. Failure to do so will result in additional disciplinary action which may involve the termination of your employment from Standard & Poor's.

(Valentine Exh. 38.)

Plaintiff states that Natale began the verbal review by describing plaintiff's performance as "dismal," reflecting plaintiff's status as the first analyst in the history of the department who had received unsatisfactory evaluations from all four services. (Pl.'s Mem. at 14.) Plaintiff claims, however, that he found it "indicative of gross discrimination to allege that the analyst who was once ranked as the # 1 analyst by *every* service before management knew of his manic-depression was now being told by the research directors that he had the 'worst' review in the history of the department." (*Id.*) Plaintiff points out that he was ranked fourth from the bottom, rather than last, indicating that he had not gotten the worst review in the history of the department. (*Id.*) Plaintiff's written performance review covering the period of July 1, 1994 through June 30, 1995, however, shows that he needed improvement in sixteen out of twenty categories. (Valentine Exh. 45.) Plaintiff only met the requirements in the categories of "[a]ccuracy-lack of mistakes," "[u]nderstanding work procedures, methods and techniques," "cooperates with others in group," and "respect and consideration for others." (*Id.*) The evaluation had two written comments: "Paul was given a written warning because of his poor work performance in first half of 1995" and "[w]e have rec'd

many customer complaints about Paul's analytical skills." (*Id.*)

By July 1995, three months prior to his termination, plaintiff was ranked twentieth out of twenty-two analysts. (Valentine Aff., Exh. E at 107.) Plaintiff's only written comment concerning his review was that "[c]omments will be made directly to EEOC." (Pl. Dep. at 764.) Plaintiff describes his reaction as follows:

> [w]ell, I thought, I felt the across-the-board dismal rankings that I received in the department, especially from Industry Surveys, where I had reformatted my survey along the lines that Industry Surveys had requested in 1995, the fact that my Stock Reports were substantially overdue only in June, and the fact that now I was not being given analytical companies to replace the semi-conductor companies that had been taken away from me, and the fact here I was the number one stock picker in the department, and this company was paying bonuses based on stock recommendations, that entered the mutual fund business in 1995 largely because of the performance numbers they were able to put out—because my stocks in 1994 were up 75 percent, and I felt I was being discriminated against across the board. . . .
>
> I thought it was discriminatory across the board, and particularly in Industry Surveys, where I put in a lot of work and everybody else was late with their surveys; mine didn't stand out in that capacity.

(Pl.'s Dep. at 765–67.)

### B. Alleged Efforts to Place Plaintiff on Disability

Plaintiff claims that in addition to discriminatory reviews, S & P's "[d]iscrimination under the ADA included efforts to place [him] on disability that were of a continuing nature and began on or about August, 1991 in a meeting with Robert Natale." (2d Am. Compl. ¶ 8.) According to plaintiff, Natale suggested to plaintiff during his review that if his poor performance was a result of his illness, "perhaps a doctor would disable [him]" and that by

going on disability plaintiff might be able to "extend the payments as opposed to just collecting unemployment if [he] was fired." (Valentine Aff., Exh. E at 16; Pl.'s Dep. at 396–97.) Plaintiff maintains that this type of discrimination continued three years later in the form of a memorandum dated November 8, 1994, in which Temme suggested that plaintiff's guild "may want to advise Paul that he contract [sic] the Employee Assistan[ce] Program who would assist Paul in providing determination of a disability and suggest a treatment program." (Valentine Aff., Exh. E at 20.)

In addition, at the October 16, 1995 meeting with Temme, Natale and Coyle regarding co-worker complaints about plaintiff's erratic behavior, Temme asked plaintiff about his health and stated that plaintiff had the option of using the Employee Assistance Program. (Pl.'s Mem. at 14; Valentine Aff., Exh. E at 95; Pl.'s Dep. at 769.) Several days later, S & P requested that plaintiff provide a letter from his psychiatrist confirming his ability to perform his job duties. (Pl.'s 56.1 ¶ 13; Def.'s 56.1 ¶ 13; Pl.'s Dep. at 401, 773–74.) Plaintiff's psychiatrist provided the requested letter confirming plaintiff's ability to perform his job functions and responsibilities. (Valentine Exh. 46.) However, in the October 27, 1995 meeting concerning plaintiff's threatening voicemail message, plaintiff was advised to consult his psychiatrist regarding whether the doctor had changed his opinion. (Pl.'s Mem. at 17–18; Pl.'s Dep. at 409–10.) According to plaintiff, Temme suggested that plaintiff "should go spend the afternoon and talk to [his] psychiatrist." However, when plaintiff and his doctor subsequently spoke, Dr. Braverman informed him that "he was not considering changing his opinion." (Pl.'s Dep. at 777.) Days later, on October 31, 1995, plaintiff was notified that he was terminated. (Valentine Exh. 47.)

### C. The Stop-loss Program

Plaintiff also alleges that S & P's implementation of the stop-loss program evinced

discrimination against him. By memorandum dated April 10, 1995, S & P informed plaintiff that he and another employee were being placed in a pilot stop-loss program. (Valentine Exh. 32; Pl.'s Mem. at 12.) The program was designed to automatically change an analyst's rating for a stock, if that stock's performance changed significantly, in order to protect against potential losses. (Valentine Aff., Exh. E at 21; Valentine Exh. 32.) Plaintiff claims that the stop-loss program constituted discrimination against him by S & P because: (1) the program only included the two analysts who were perceived by S & P as being mentally ill (Pl.'s Dep. at 712–13); and (2) plaintiff's stock recommendations in the first quarter of 1995 outperformed five of the approximately twenty other analysts in his department. (Valentine Exh. 33.)

Although plaintiff maintains that S & P's motivation for implementing this program was discriminatory, S & P informed plaintiff that he and his co-worker were selected for the program because they both covered particularly volatile industries. (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8.) Plaintiff admits that he did cover "two of the most volatile groups in the stock market, the semiconductor stocks and the toy stocks." (Pl.'s Dep. at 701.) Moreover, despite plaintiff's claim that he was the number one stock picker in his department, he acknowledges that during the first half of 1995 he made "an error" by refusing to recommend certain semiconductor stocks that were "performing very strongly," and that had been rated favorably by other Wall Street analysts, because he felt they "were near a cyclical peak." (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8; Pl.'s Dep. at 703–04, 710.) According to plaintiff, he rated these stocks as "One Stars" and maintained a sell recommendation for several months, when the stocks were "one of the hottest groups in the stock market," because he expected a downturn. (Pl.'s Dep. at 703–04.) Plaintiff now admits "in hindsight" that he should have kept the stocks rated as "Five Star" recommendations through-

out the first quarter of 1995. (Pl.'s Dep. 709–10.)

Plaintiff further admits that his failure to recommend these stocks for purchase prompted a series of complaints from at least one portfolio manager, who wanted to purchase the stocks, but was precluded from doing so because Valentine had not recommended them. (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8.) In the spring of 1995, the manager of S & P's Stars Portfolio, a mutual fund, wrote to S & P objecting to being closed out of certain profitable investments because of plaintiff's unfavorable recommendations. (Pl.'s Dep. at 705–06.) Plaintiff has made no allegations to suggest the existence of any other S & P analyst who caused similar complaints, but was not made to participate in the stop-loss program.

On May 9, 1995, the Guild filed a grievance alleging that plaintiff had been singled out for inclusion in the stop-loss program and stating that:

> [i]n the Guild's opinion, Paul Valentine's analytical record does not warrant exclusive scrutiny from that of other analysts. In the first quarter of 1995, Paul's 5 Star performance was above that of [five other S & P analysts], and nearly even with [another's]. Since Performance Cross Reference has been tracked since Dec. 31, 1986, Paul's 5 Star performance ranks first and is well above the approximately 15 analysts who have similarly been tracked. Additionally, Paul's 5 Star performance is over five times greater than the S & P 500 Index rating since Dec. 31, 1986.

(Valentine Exh. 33; see also Pl.'s 56.1 ¶ 9; Def.'s 56.1 ¶ 9.) The grievance made no reference to plaintiff's mental illness, although plaintiff now claims his inclusion in the program reflected S & P's discriminatory conduct towards him based on his manic-depression. (Valentine Aff., Exh. E at 120.)

S & P responded to the Guild by memorandum dated May 18, 1995, stating that plaintiff and another analyst:

were selected to participate in this pilot program because of the high volatility of the industries they follow and because these analysts both have had a number of five star picks which have resulted in sizable losses. (Valentine Exh. 36.) S & P further stated that "[i]n settlement of this grievance, [a third analyst] has been added ... who will participate in this pilot program." (*Id.*) However, "[p]laintiff disputes that he ever considered the grievance 'settled' by subjecting another Analyst ... to 'stop loss' restrictions." (Pl.'s 56.1 ¶ 9.) The stop-loss program was disbanded by the summer of 1995. (Pl.'s Dep. at 728.)

Plaintiff maintains that he and only one other analyst were initially included in the program because both were perceived by S & P as having mental illnesses. (Pl.'s Mem. at 12.) Although S & P alleges that the other analyst had no record "of being disabled or mentally or physically impaired in any way," plaintiff claims that in the other analyst's February 1995 semi-annual review Natale asked the analyst "if he had any personal problems and then asked him if he suffered from depression." (Def.'s 56.1 ¶ 9; Pl.'s 56.1 ¶ 9; Pl.'s Dep. at 713.) Plaintiff further claims that this analyst was ultimately "fired because management thought he was mentally ill." (Pl.'s Mem. at 14.) Plaintiff admits, however, that he does not believe the other analyst actually suffered from depression and that the industry he covered "could be volatile." (Pl.'s Dep. at 48, 51, 712.) In addition, plaintiff admits that this analyst kept unusual hours and that "his work habits were also a factor in that dismissal." (Pl.'s Dep. at 50–51, 53.) Plaintiff further admits that the third analyst who was later chosen for the program also covered a volatile industry and had made "some poor recommendations in the recent past." (*Id.* at 728.)

### D. Plaintiff's Change In Duties

Plaintiff further alleges that "[i]n late June 1995[he] was effectively demoted when the semiconductor stocks that [he] followed were taken away from [him]." (Pl.'s Mem. at 13.) Although this change in duties was preceded by plaintiff's admitted failure to recommend several strongly performing semiconductor stocks, which prompted a vigorous complaint from a fund manager, plaintiff now claims that his change in duties constituted discrimination against him by S & P in violation of the ADA. (2d Am.Compl.¶ 8.) According to plaintiff, S & P diminished plaintiff's analytical and stock picking functions and reassigned him to duties that were "factual" in nature, such as condensing company information without analysis. (Pl.'s Mem. at 13; Valentine Exh. E at 23, 86.) Plaintiff claims that while he was initially told this factual assignment was temporary, he was ultimately informed that the change would be permanent, although his salary would remain unchanged as an "accommodation." (Pl.'s Mem. at 13; Pl.'s Dep. at 745.) Plaintiff further maintains that "this action was designed to make [his] job so demeaning for someone with [his] credentials that [he] would face no other choice but to quit." (Pl.'s Mem. at 13.) A union representative subsequently met with Temme "and charged him with creating an environment of construction [sic] discharge because of the harassment [plaintiff] was receiving from management." (*Id.* at 13–14.)

### III. Procedural History

Plaintiff filed a charge of discrimination with the EEOC on September 7, 1995. In his EEOC complaint, plaintiff charged S & P with discriminating against him on the basis of his disability. Defendant suspended plaintiff with pay on October 27, 1995, and then terminated his employment on October 31, 1995. The EEOC issued plaintiff a Right to Sue letter on September 10, 1996. Plaintiff, however, did not receive the right to sue letter until November 1, 1996. Plaintiff commenced the instant action on January 2, 1997, repeating the charge of defendant's discrimination based on his disability and adding a claim of retaliatory discharge based upon plaintiff's filing of discrimination charges with the EEOC. Plaintiff filed an Amended

Complaint with substantially the same allegations on February 13, 1997. At a conference on February 21, 1997, this Court granted plaintiff permission to file a Second Amended Complaint. The Second Amended Complaint, filed on March 11, 1997, alleges discriminatory conduct by defendant from approximately October 1990 through October 1995 and also alleges that defendant terminated his employment in retaliation for the filing of the discrimination charges with the EEOC. After limited discovery, defendant's motion for summary judgment followed.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when the pleadings, depositions, answers to interrogatories, and admissions to file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); see Anderson v. Liberty Lobby Inc., 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying those portions of the record it "believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the opposing party cannot rest on "mere allegations or denials," but must "set forth specific facts showing there is a genuine issue for trial;" Fed.R.Civ.P. 56(e).

In determining whether summary judgment is appropriate, the Court must "view the evidence in the light most favorable to the nonmoving party," and resolve all ambiguities and "draw all reasonable inferences" in its favor. American Casualty Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir.1994); see Anderson, 477 U.S. at 255, 106 S.Ct. 2505. Only when it is apparent that no rational trier of fact "could find in favor of the nonmoving party because the evidence to support its case is so slight" should summary judgment be granted. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.1994).

Furthermore, the Second Circuit has also cautioned that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.'" Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (quoting Gallo, 22 F.3d at 1224).

Moreover, where, as here, a party is proceeding pro se, the Court must judge the pleadings on "less stringent standards than formal pleadings drafted by lawyers." Haines v. Kerner, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652 (per curiam); accord Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir.1994) ("[W]e read [the pro se party's] supporting papers liberally, and will interpret them to raise the strongest argument they suggest."). Nonetheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment. See Lee v. Coughlin, 902 F.Supp. 424, 429 (S.D.N.Y. 1995) ("a pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment.") (citing Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1991)), reh'g granted on other grounds, 914 F.Supp. 1004 (S.D.N.Y.1996). A pro se party must still allege specific facts establishing the elements of his or her claim to survive a motion for summary judgment.

## DISCUSSION

I. The Applicable Limitations Period

The ADA incorporates by reference the statutory limitations provisions set forth in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(e)(1), for employment discrimination actions. See 42 U.S.C. § 12117. Generally, an administrative charge alleging violation of the ADA must be filed with the EEOC within

180 days of the alleged discriminatory conduct. *See* 42 U.S.C. § 2000e–5(e)(1). In a "deferral" state such as New York, however, in which there is a designated state or local agency with jurisdiction to consider discriminatory employment claims, the limitations period for filing charges with the EEOC is extended to 300 days. *See Id;* 29 C.F.R. § 1601.13; *Ford v. Bernard Fineson Dev. Ctr.,* 81 F.3d 304, 307 (2d Cir.1996); *Nweke v. Prudential Ins. Co. of America,* 25 F.Supp.2d 203, 216 (S.D.N.Y. 1998); *Settecase v. Port Auth. of N.Y. and N.J.,* 13 F.Supp.2d 530, 533 (S.D.N.Y. 1998). This requirement is not jurisdictional, but is instead analogous to a statute of limitations, in that any claim not brought within this period is time barred and may not be the basis for relief in federal court. *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 765 (2d Cir.1998); *Butts v. City of New York,* 990 F.2d 1397, 1401 (2d Cir.1993).

In the instant case, plaintiff filed his charge with the EEOC on September 7, 1995. Accordingly, he is barred from asserting any claims of discriminatory conduct alleged to have occurred prior to November 11, 1994, 300 days before the filing of the EEOC charge.

 Plaintiff's allegations prior to November 11, 1994 do not fall within the "continuing violation" exception to the Title VII limitations period. "The continuing-violation exception 'extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations.'" *Quinn,* 159 F.3d at 765 (citing *Annis v. County of Westchester,* 136 F.3d 239, 246 (2d Cir.1998)). A continuing violation may be found "where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory practice." *Cornwell v. Robinson,* 23 F.3d 694, 704 (2d Cir.1994). Nev-

ertheless, "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 53 (2d Cir.1993). As plaintiff fails to link his allegations of discrimination to any policy or mechanism at S & P, his claims regarding discriminatory conduct prior to November 11, 1994 are insufficient to establish a continuing violation and are therefore time-barred. *See Quinn,* 159 F.3d at 766 (acts sufficiently isolated in time break 'the asserted continuum of discrimination).

## II. Plaintiff's ADA Claims

Plaintiff brings his action, under the ADA, alleging that defendant discriminated against him on the basis of his disability and terminated his employment after he filed charges with the EEOC. The ADA prohibits covered employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

### A. The Applicable Legal Framework

 In order to withstand summary judgment on his claim, plaintiff must establish an inference of discrimination under the three-tiered test set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Under the first tier, plaintiff is required to present a prima facie case of discrimination by showing that: (1) his employer is subject to the ADA; (2) plaintiff suffers from a disability within the meaning of the ADA; (3) plaintiff could perform the essential functions of his job with or without reasonable accommodation; and (4) plaintiff was fired or otherwise discriminated against because of his disability.[13] *Reeves v. Johnson Con-*

---

**13.** It is undisputed for the purpose of this

motion that S & P is an employer covered by

*trols World Services, Inc.*, 140 F.3d 144, 149 (2d Cir.1998); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 869–70 (2d Cir. 1998). Once established, the prima facie case gives rise to an inference of discrimination because " 'we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.' " *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978)). In effect, establishment of the prima facie case "creates a presumption that the employer unlawfully discriminated against the employee." *Id.*

■ Presented with this inference of discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the employee's discharge. *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. At this stage, the employer need only articulate— but need not prove—the existence of a nondiscriminatory reason for its decision. *Burdine*, 450 U.S. at 254–56, 101 S.Ct. 1089. "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity." *Id.* at 255, 101 S.Ct. 1089; *see also Fisher v. Vassar College*, 114 F.3d 1332, 1337 (2d Cir.1997) (*en banc*) ("presumption disappears once employer has proffered a reason"), *cert. denied,* —— U.S.

——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Hawkins v. Astor Home for Children*, 96 Civ. 8778(SS), 1998 WL 142134, at *5 (S.D.N.Y. March 25, 1998) (although "the facts of a prima facie case are sufficiently correlated to discrimination to require an answer," the correlation is "too weak to support such a finding once the defendant has answered").

■ Once defendant meets its burden of production, the burden shifts back to plaintiff. Under the third tier of the *McDonnell Douglas* test, plaintiff bears the ultimate burden of proving that the reason proffered by the employer is a pretext for unlawful discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 516–18, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ("inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced"). In order to survive a motion for summary judgment, plaintiff must " 'establish a genuine issue of material fact ... as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision.' " [14] *Berk v. Bates Advertising USA, Inc.*, No. 94 Civ 9140(CSH), 1997 WL 749386, at *3 (S.D.N.Y. Dec. 3, 1997) (quoting *Gallo v. Prudential Residential Services, Ltd.*, 22 F.3d 1219, 1225 (2d Cir.

the ADA and that Valentine is an individual with a disability afforded statutory protection.

14. The Second Circuit has held that, sometimes, the prima facie case of discrimination alone may be sufficient to withstand summary judgment. *See Fisher,* 114 F.3d at 1343. Once defendant has produced a nondiscriminatory explanation for the discharge, however, "the prima facie case loses its capacity to support the (previously presumed) inference of illegal discrimination, other than by whatever intrinsic force the constituent evidence may have." *Id.* at 1342. Forms of evidence such as "a statistical showing that a pattern of employment practices affect members of a protected class in a disparate manner" or a "showing of invidious comments made to-

wards members of the class" that are presented in plaintiff's prima facie case may create an inference of discrimination more directly. *Hawkins,* 1998 WL 142134, at *6 (citations omitted). "The inference of discrimination which arises from this type of evidence is not dispelled merely by the offering of a legitimate reason for the discharge, and its intrinsic force thus remains available to support plaintiff's ultimate burden on summary judgment." *Id.* (internal quotations omitted); *cf. Hollander v. American Cyanamid Co.,* 172 F.3d 192 (2d Cir.1999) (affirming summary judgment where no reasonable jury could infer from statistical evidence that employer discriminated against employee because of age).

1994)); *see also Johnson v. Nat'l Maritime Union Pension and Welfare Plans,* No. 95 Civ 4112(LMM), 1998 WL 32759, at *4 (S.D.N.Y. Jan. 29, 1998) ("when an employer provides convincing evidence to explain its conduct and plaintiff's argument consists of purely conclusory allegations of discrimination, the court may conclude that no material issues of fact exist and it may grant summary judgment to the employer").

**B. Plaintiff's Claims of Unequal Terms and Conditions of Employment**

Plaintiff alleges that S & P's discrimination against him was reflected in poor performance reviews, "offers" to grant him disability leave, the implementation of a stop-loss system and the reassignment of certain of his duties. However, plaintiff cannot sustain an action based on his conclusory allegations of discrimination. *Johnson v. Nat'l Maritime Union Pension and Welfare Plans,* No. 95 Civ. 4112(LMM), 1998 WL 32759, at *4 (S.D.N.Y. Jan.29, 1998) ("when an employer provides convincing evidence to explain its conduct and the plaintiff's argument consists of purely conclusory allegations of discrimination, the court may conclude that no material issues of fact exist and it may grant summary judgment to the employer"). The actions plaintiff perceives as reflecting a pattern of discrimination over the course of his thirteen years of employment, S & P convincingly presents as legitimate, nondiscriminatory actions and ongoing efforts to keep plaintiff on the job despite the undisputed fluctuation in his performance. (Pl.'s Mem. at 7; Pl.'s Dep. at 433, 680–81.) Plaintiff has offered nothing more than his own conclusion that S & P's actions prior to his termination for misconduct were a pretext for discrimination.

**1. *Plaintiff's Performance History at S & P.***

 Plaintiff asserts that his poor performance reviews are attributable to discrimination based on his disability. However, plaintiff has failed to satisfy all the requirements of a prima facie case in connection with this claim. Establishing a prima facie case requires a plaintiff to show that his employer's discriminatory action caused "a materially adverse change" in the terms and conditions of his employment. *McKenney v. New York City Off–Track Betting Corp.,* 903 F.Supp. 619, 623 (S.D.N.Y.1995) (Title VII Retaliation claim); *see also Goodman v. New York City Off–Track Betting Corp.,* 97 Civ. 4708(DAB), 1999 WL 269959, at *10 (S.D.N.Y. May 4, 1999) (Title VII claim); *Castro v. New York City Bd. of Educ.,* 96 Civ. 6314(MBM), 1998 WL 108004, at *6 (S.D.N.Y. March 12, 1998) (Title VII and ADEA claims); *Davis v. City of New York,* 94 Civ. 7277(SHS), 1996 WL 243256, at *8 (S.D.N.Y. May 9, 1996) (Title VII claim). A "material adverse change" is one that "has an attendant negative result, a deprivation of a position or an opportunity." *Medwid v. Baker,* 752 F.Supp. 125, 136–37 (S.D.N.Y.1990) (citations omitted) (ADEA claim). The change in the terms and conditions of employment "must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A material adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, less distinguished title, a material loss of benefits, or other indices that might be unique to a particular situation." *Monica v. New York City Off–Track Betting Corp.,* 93 Civ. 6371(RPP), 1995 WL 117879, at *4 (S.D.N.Y. March 20, 1995) (quoting *Crady v. Liberty Nat'l Bank and Trust Co. Of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)), *aff'd,* 1996 WL 2061 (2d Cir. Jan.3, 1996); *see also Campbell v. Grayline Shuttle, Inc.,* 930 F.Supp. 794, 802 (E.D.N.Y.1996) (application of Title VII "material adverse change" requirement to ' Section 1981 claim).

 Negative evaluations alone, without any accompanying adverse result, however, are not cognizable. *See Johnson v. City of Fort Wayne,* 91 F.3d 922 (7th Cir.1996) (negative employment evalua-

tions did not constitute adverse employment action); *Smart v. Ball State Univ.,* 89 F.3d 437, 442 (7th Cir.1996) (negative performance ratings alone did not constitute adverse employment actions); *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994) (a performance review that is lower than past reviews but within the range of satisfactory does not constitute an adverse employment action); *Gallo v. Herman,* 97 Civ. 8359(JSR), 1999 WL 249709 (S.D.N.Y. April 28, 1999) (plaintiff has not adduced any evidence that receipt of "still-high but no t-quite-as-high-as-previous rating caused any material impact on term or condition of [his] employment"); *Castro,* 1998 WL 108004, at *7 (negative evaluations "unattended by a demotion, diminution of wages, or other tangible loss do not materially alter employment conditions").

■ Plaintiff fails to show that his poor performance reviews caused a materially adverse change in the conditions of his employment. Plaintiff does not point to any negative consequences flowing from his poor reviews, such as demotion, suspension, loss of wages or any action which marked him as a less capable analyst. *See Castro,* 1998 WL 108004, at *7. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart,* 89 F.3d at 441; *see also Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997) ("[b]ecause there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of 'adverse' "). Plaintiff's subjective perception that he received poorer performance reviews than he deserved does not constitute sufficient adverse employment action for purposes of stating a prima facie case. *See Garber v. New York City Police Dept.,* No. 95 Civ. 2516(JFK), 1997 WL 525396, at *6 (S.D.N.Y. Aug.22, 1997) (plaintiff's purely subjective feelings did not negatively alter terms and conditions of employment), *aff'd,* 159 F.3d 1346 (2d Cir.1998). Given that plaintiff's negative reviews did not lead to any immediate tangible harm or consequences, they do not constitute adverse actions materially altering the conditions of his employment. *See Smart,* 89 F.3d at 442; *Castro,* 1998 WL 108004, at *7. Thus, plaintiff has failed to establish a prima facie case that S & P discriminated against him on the basis of his disability by giving him poor performance evaluations.

■ Even assuming, arguendo, that plaintiff had established a prima facie case with respect to the poor performance reviews, he fails to make a sufficient showing that S & P's proffered reasons for the reviews are merely a pretext for discrimination. Most of plaintiff's allegations of discrimination relating to his poor reviews are based on conclusory statements and plaintiff's feelings, beliefs and judgment about his own self-worth. *See Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 130 (2d Cir.1996) (assertion of personal beliefs is insufficient to show pretext), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997). Plaintiff does not dispute, however, that during the period in question he had emotional problems that seriously affected his performance. Instead, plaintiff claims that his harsh evaluations were inconsistent with his alleged proficiency in rating stocks and his early success at S & P in the mid–1980s. The criticisms that were leveled at plaintiff, both before and after the disclosure of his mental illness, however, dealt with his sloppiness, lateness, inattentiveness, lack of creativity, poor writing, weak analysis, impressions created outside the department and relationships with others, not his stock recommendations. (Valentine Aff., Exh. E at 14, 20, 63, 78, 79; Valentine Exh. 18, 38, 45.) In any event, plaintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim. *See Jimoh v. Ernst & Young,* 908 F.Supp. 220, 226 (S.D.N.Y.1995) (to prove discrimination, "plaintiff must do more than simply disagree with his employer's business decisions"). Thus, plaintiff fails

to sustain his burden of showing that S & P's articulated, nondiscriminatory reasons for his poor performance reviews were pretextual and that S & P in fact harbored discriminatory animus.

### 2. *Alleged Efforts to Place Plaintiff on Disability*

Similarly, the statements by S & P which plaintiff perceives as ongoing efforts to place him on disability leave are insufficient to create an inference of discrimination. *See supra*, Section II.B, at pp. 276 – 277 for a description of these statements. As previously discussed, plaintiff again fails to state a prima facie case because he has not shown that S & P's actions caused a "materially adverse change" in the terms and conditions of his employment. Plaintiff does not dispute that his preference to refuse disability leave was honored over the course of his thirteen years of employment at S & P.

In addition, even assuming for the sake of argument that plaintiff had stated a prima facie case with respect to this claim, he has not shown that S & P's statements to him were a pretext for discrimination. While plaintiff suggests that by offering him the option of disability leave S & P exhibited discriminatory animus towards him, an employer's obligation to refrain from discriminating against disabled employees surely does not require an employee's disability to be ignored. *See EEOC v. Prevo's Family Market, Inc.*, 135 F.3d 1089, 1094–95 (6th Cir.1998) ("the purpose of the ADA was not to create impediments for such employer-employee cooperation, but to promote an interactive dialogue between an employer and employee to discover to what extent the employee is disabled and how the employee may be accommodated, if at all, in the workplace"); *Johnson v. Boardman Petroleum, Inc.*, 923 F.Supp. 1563, 1568–69 (S.D.Ga.1996) (characterizing employer's suggestion that plaintiff seek help, while on leave, as a "humanitarian gesture" and chastising plaintiff for her "misguided" response).

Moreover, while suggestions that plaintiff consider the option of taking a disability leave certainly demonstrate that S & P was aware of plaintiff's mental illness, "[m]ere knowledge of a disability cannot be sufficient to show pretext." *Christopher v. Adam's Mark Hotels*, 137 F.3d 1069, 1073 (8th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 62, 142 L.Ed.2d 49 (1998). Like the statements at issue here, comments acknowledging a plaintiff's protected status, which do not provide some indication of disapproval of the plaintiff's membership in such class, fail to demonstrate bias. *Jalal v. Columbia Univ.*, 4 F.Supp.2d 224, 236 (S.D.N.Y.1998) ("[s]tatements that merely acknowledge a person's membership in a Title VII-protected class similarly fail to demonstrate bias"). Thus, S & P's mere mention of disability leave to plaintiff on a few isolated occasions fails to demonstrate pretext.

### 3. *The Stop-loss Program*

Plaintiff's claim concerning his placement in S & P's stop-loss program (*see infra*, Section II.C, at pp. 277 – 278) also fails to create a sufficient inference of discrimination to survive summary judgment. While plaintiff believes that he was made to participate in the program on account of his mental illness, his beliefs and conclusory allegations do not support a showing that S & P's articulated reasons for plaintiff's inclusion in the program were a pretext for discrimination. *See Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir.1995) ("[t]he party opposing summary judgment may not rely simply on conclusory statements" or "unsupported assertions"); *Johnson v. New York Hosp.*, No. 97 Civ. 7089(LAP), 1998 WL 851609, at * (S.D.N.Y. Dec.9, 1998) (summary judgment granted to employer in ADA case where plaintiff's conclusory allegations failed to demonstrate that the nondiscriminatory reason proffered by employer was a pretext for discriminatory treatment).

Plaintiff does not dispute that he and the other analysts selected to participate in the program covered volatile industries. (Pl.'s Dep. at 701, 712, 728.) In addition, plaintiff admits that during the first quarter of 1995 he made an error by refusing to recommend certain stocks that were performing very strongly and had been favorably appraised by other Wall Street analysts. (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8; Pl.'s Dep. at 703-04, 710.) Plaintiff further admits that his error prompted a vigorous complaint from a portfolio manager who wished to purchase the stocks, but was precluded from doing so because plaintiff had not recommended them. (Pl.'s 56.1 ¶ 8; Def.'s 56.1 ¶ 8.) Plaintiff has alleged nothing to suggest the existence of any other S & P analyst who caused similar complaints, but was not made to participate in the stop-loss program. Thus, plaintiff has failed to meet his burden of showing that S & P's proffered reason for placing plaintiff in the stop-loss program was actually a pretext for discrimination.

#### 4. *Plaintiff's Change In Duties*

■ The terms and conditions of plaintiff's employment, however, were arguably adversely affected by the reduction of his analytical and stock picking functions and his reassignment to responsibilities in the factual area. A "materially adverse change" includes changes in employment which significantly reduce job duties or prestige. *See Preda v. Nissho Iwai American Corp.*, 128 F.3d 789, 791 (2d Cir.1997) (material change when employer excluded plaintiff from meetings and reduced job duties to largely clerical tasks); *de la Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 21 (2d Cir.1996) (transfer from elite to less prestigious position may arguably be materially adverse change). The fact that plaintiff did not suffer any economic damages, such as a reduction in salary, does not preclude the claim. *Curley v. St. John's Univ.*, 19 F.Supp.2d 181, 190 (S.D.N.Y.1998) (job changes which significantly reduce job duties without immediate financial impact can be materially adverse). Thus, although plaintiff's salary

remained unchanged, plaintiff has provided sufficient evidence indicating that his reassignment to new duties in the factual area, where he was relegated to condensing information rather than performing analysis, significantly diminished his job responsibilities.

■ Despite his presentation of a bare-bones prima facie case, however, plaintiff's claim regarding the change in his duties must still be dismissed. Plaintiff fails to adduce sufficient evidence to rebut S & P's proffer of legitimate, nondiscriminatory reasons for assigning plaintiff new responsibilities. *See McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1827; *Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir.1997) (en banc). It is undisputed that plaintiff was informed that his analytical and stock picking functions were being reduced, and that he was being assigned new responsibilities in the factual area, due to the complaint received from a portfolio manager who was furious about plaintiff's refusal to recommend several strong performing semiconductor stocks. (Pl.'s Dep. 737–39; Valentine Exh. 38.) Having failed to rebut this articulated reason, plaintiff has failed to satisfy his burden of showing that S & P's nondiscriminatory justification for assigning plaintiff new responsibilities was pretexual.

### C. Plaintiff's Termination Claims

#### 1. *Discriminatory Discharge Claim*

S & P maintains that the ADA does not immunize disabled employees from discharge for incidents of misconduct in the workplace and that plaintiff has failed to sustain his burden of demonstrating that he was qualified to perform the essential functions of his job. Thus, defendant argues, even assuming that plaintiff has established the first and second prongs of his prima facie case, plaintiff still fails to satisfy the third prong with respect to his discriminatory discharge claim.

The ADA defines a "qualified individual with a disability" to mean "an individual with a disability who, with or without rea-

sonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); see 29 C.F.R. § 1630.2(m); see also Stone v. City of Mount Vernon, 118 F.3d 92, 96 (2d Cir. 1997) (setting forth the definition of "qualified" under federal disability statutes),[15] cert. denied, — U.S. ——, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998). Plaintiff bears both the burden of production and persuasion on the issue of whether he is otherwise qualified to perform his particular job, despite his disability. Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 137 (2d Cir.1995); Serrano v. The Shield Inst. of David, Inc., No.94 Civ. 6745(MBM), 1997 WL 167042, at *5 (S.D.N.Y. April 9, 1997). "A plaintiff cannot be considered 'otherwise qualified' unless she [or he] is able, with or without assistance, to perform the essential functions of the job in question". Borkowski, 63 F.3d at 137–38; see also Wiebke v. Hanjin Shipping Co., No. 97 Civ. 7287(JSM), 1999 WL 292554 (S.D.N.Y. May 7, 1999) (plaintiff who failed to show that he was performing his duties satisfactorily failed to establish a prima facie case of age and national origin discrimination); Richardson v. Westchester County, No. 96 Civ. 9674(DLC), 1998 WL 373422, at *4 (S.D.N.Y. July 6, 1998) (granting summary judgment against plaintiff because he failed to present sufficient evidence of his ability to perform essential functions of the job with or without reasonable accommodation).

Courts have defined "essential functions" to mean the affirmative duties or inherent parts of a job. "To be qualified, an individual must satisfy the requisite skill, experience, education and other job-related requirements of the employment position...." Misek–Falkoff v. I.B.M. Corp., 854 F.Supp. 215, 226 (S.D.N.Y. 1994), aff'd, 60 F.3d 811 (2d Cir.1995). It

is well established that the ADA does not protect plaintiffs who are unable to meet these requirements. See Altman v. New York City Health and Hosp. Corp., 100 F.3d 1054, 1061 (2d Cir.1996) (affirming summary judgment for employer where "Altman's disability would prevent him from performing in a reasonable manner the activities involved in the position of Chief of Internal Medicine"); Serrano, 1997 WL 167042, at *5 (granting summary judgment to employer where "[p]laintiff admitted during his deposition that he was unable to perform the essential functions" of his job); Quintana v. Sound Distribution Corp., No. 95 Civ. 0309(LAP), 1997 WL 40866, at * 5 (S.D.N.Y. Feb.3, 1997) (granting summary judgment to employer where defendants demonstrated that plaintiff was unable to perform essential functions of his job); see also EEOC v. Amego, Inc., 110 F.3d 135, 144 (1st Cir.1997) (granting summary judgment to employer where plaintiff could not be trusted to safely dispense medication, an essential function of her job); Martinson v. Kinney Shoe Corp., 104 F.3d 683, 687 (4th Cir. 1997) (granting summary judgment to employer where maintaining store security was an essential function of a salesperson's job and the evidence was uncontroverted that plaintiff was not qualified to perform this function).

In addition, a disabled plaintiff ceases to be otherwise qualified for a position when she or he engages in misconduct in violation of a workplace policy of the employer or poses a direct threat to the health or safety of others which cannot be eliminated by a reasonable accommodation. See 42 U.S.C. § 12113(b) ("an individual shall not pose a direct threat to the health or safety of other individuals in the workplace"); Adams v. Rochester Gen. Hosp., 977 F.Supp. 226, 233–34 (W.D.N.Y.1997) ("[w]here the record demonstrates that an

---

**15.** Terms common to the regulatory schemes under the ADA and the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. (the "Rehabilitation Act"), are to be interpreted the same way. See 42 U.S.C. § 12117(b) (federal agencies administering federal disability statutes

are to avoid subjecting employment discrimination claims to "inconsistent or conflicting standards"); 29 U.S.C. § 794(d) (Rehabilitation Act is to be interpreted in accordance with the standards applied under the ADA).

employee poses a significant risk to the health and safety of others which cannot be eliminated by reasonable accommodation, summary judgment in favor of the employer is appropriate"); *Altman v. New York City Health and Hosp. Corp.*, 903 F.Supp. 503 (S.D.N.Y.1995) (conduct demonstrated to be a manifestation of plaintiff's disability which may implicate public safety concerns should be considered when determining whether plaintiff is otherwise qualified), *aff'd*, 100 F.3d 1054 (2d Cir. 1996); *see also Hamilton v. Southwestern Bell Tel. Co.*, 136 F.3d 1047, 1052 (5th Cir.1998) (affirming summary judgment for employer where plaintiff was terminated for violation of policy on workplace violence); *Palmer v. Circuit Court of Cook County, Illinois*, 117 F.3d 351, 352 (7th Cir.1997) (affirming summary judgment for employer where plaintiff threatened to kill another employee, because ADA "does not require an employer to retain a potentially violent employee"), *cert. denied*, —— U.S. ——, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998); *Amego, Inc.*, 110 F.3d at 144 (where essential job functions "necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others"); *Crawford v. Runyon*, 79 F.3d 743, 744 (8th Cir.1996) (affirming judgment against employee who threatened to hurt or kill his supervisor); *Hardy v. Sears, Roebuck and Co.*, No. 4:95–CV–0215–HLM, 1996 WL 735565, at *6 (N.D.Ga. Aug.28, 1996) (granting summary judgment to employer where plaintiff threatened safety of supervisor by asking, "Do you want to have another heart attack, that could be arranged?"); *Boldini v. Postmaster Gen. U.S. Postal Service*, 928 F.Supp. 125, 131 (D.N.H.1995) (granting summary judgment to employer where plaintiff violated provisions of employee conduct manual; "essential to the adequate performance of any job is the ability of an employee to accept and follow instructions and refrain from contentious arguments and insubordinate conduct with supervisors, co-employees or customers").

■ In the instant case, Valentine has failed to present sufficient evidence that, despite his disability, he was otherwise qualified to perform his job at S & P.[16] It is undisputed that, on October 26, 1995, plaintiff left an "obnoxious and taunting" voice mail message for a co-worker, despite having received a warning less than a year earlier about threatening a fellow employee's reputation. (Pl.'s 56.1 ¶¶ 7, 15, 16.) It is likewise undisputed that the co-worker who received the message had reason for concern that plaintiff would publicly disclose the private information plaintiff claimed to possess and that, during the ensuing disciplinary meeting, plaintiff admitted that his message was "threatening" in nature.[17] (Pl.'s 56.1 ¶ 16; Pl.'s Dep. at

---

**16.** If plaintiff's disability prevented him from being able to fulfill an essential function of his position, the ADA clearly requires an employer to reasonably accommodate plaintiff's physical or mental limitations, unless the accommodations would impose an undue hardship on the employer. 42 U.S.C. § 12112(b)(5)(A); *Wernick v. Fed. Reserve Bank of New York*, 91 F.3d 379, 384 (2d Cir.1996) ("[u]nder the disability acts, the failure to make reasonable accommodations for one who is disabled can constitute discrimination"). However, the original burden of demonstrating that an accommodation is available rests with the plaintiff and plaintiff has made no such showing. *See Borkowski*, 63 F.3d at 136; *Serrano*, 1997 WL 167042, at *5.

**17.** Although plaintiff now disputes whether the message was threatening, his *present* char-

acterization of the message is not material for the purpose of this motion. To the extent that plaintiff's own characterization is material, the pertinent issue is how plaintiff characterized the message in the days leading up to his termination, since S & P's action was based on its assessment of plaintiff's conduct at that time. It is undisputed, that plaintiff admitted to S & P a few days prior to his termination that the message was threatening and, thus, S & P had a good faith basis for viewing the message as a threat to a fellow co-worker. *See Shiflett v. GE Fanuc Automation Corp.*, 960 F.Supp. 1022, 1030 (W.D.Va.1997) ("it is irrelevant whether in fact plaintiff was guilty of such conduct; it matters only that the employer subjectively believed that this was so").

406–09, 780–81.) Based on these undisputed facts, including plaintiff's admission that he threatened a fellow employee's professional reputation and well-being in the workplace, I find that plaintiff was not otherwise qualified to perform his job at S & P.

I further note that whether Valentine's misconduct was a manifestation of his disability is immaterial because the ADA does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace. This basic principle has been repeatedly applied by Courts throughout this Circuit and elsewhere. *See Johnson v. St. Clare's Hosp. & Health Ctr.*, No. 96 Civ. 1425(MBM), 1998 WL 213203, at *7 (S.D.N.Y. April 30, 1998) ("Federal law does not require an employer to tolerate misconduct. . . merely because the employee is a recovering alcoholic or suffers from another disability"); *Brennan v. New York City Police Dep't*, No. 93 Civ. 8461(BSJ), 1997 WL 811543, at *5 (S.D.N.Y. May 27, 1997) ("termination in the context of misconduct that is tied or related to alcoholism does not violate the ADA"), aff'd, 141 F.3d 1151 (2d Cir.1998); *Husowitz v. Runyon*, 942 F.Supp. 822, 834 (E.D.N.Y.1996) (judgment for employer based on evidence that plaintiff, diagnosed with bipolar affective disorder, was uncooperative, disruptive, and "engaged in threatening conduct with his co-workers"); *Francis v. Runyon*, 928 F.Supp. 195, 205 (E.D.N.Y.1996) ("[a] disabled individual cannot be 'otherwise qualified' for a position if he commits misconduct which would disqualify an individual who did not fall under the protection of the statute"); *Misek–Falkoff*, 854 F.Supp. at 227 ("the employer may also require that employees, whether handicapped or not, not cause, or contribute to, undue interruptions and hostility in the workplace"); *see also Hamilton*, 136 F.3d at 1052 ("the ADA does not insulate emotional or violent outbursts blamed on an impairment" and "[a]n employee who is fired because of outbursts at work directed at fellow employees has no ADA claim"); *Palmer*, 117 F.3d at 352 ("[i]f an employer fires an employee because of the employee's unacceptable behavior, the fact that that behavior was precipitated by a mental illness does not present an issue under the [ADA]"); *Martinson*, 104 F.3d at 686 n. 3 ("misconduct—even misconduct related to a disability—is not itself a disability, and an employer is free to fire an employee on that basis"); *Williams v. Widnall*, 79 F.3d 1003, 1006 (10th Cir.1996) (affirming summary judgment for employer where alcoholic employee was discharged for threatening colleagues); *Breiland v. Advance Circuits, Inc.*, 976 F.Supp. 858, 865 (D.Minn.1997) (granting summary judgment for employer where plaintiff violated workplace policies; employer is not obligated by the ADA "to ignore plaintiff's misconduct"); *Shiflett v. GE Fanuc Automation Corp.*, 960 F.Supp. 1022, 1029–30 (W.D.Va.1997) (granting summary judgment to employer where employee harassed and intimidated colleague), aff'd, 151 F.3d 1030 (4th Cir.1998); *Schutts v. Bentley Nevada Corp.*, 966 F.Supp. 1549, 1555 (D.Nev.1997) ("[a]n employee who commits an act of misconduct may be fired, whether he or she is disabled within the meaning of the ADA, or an astronaut or Olympic athlete. . . statutes which bar discrimination do not insulate disabled employees from discharge for acts for which a non-disabled employee could certainly be fired"). "The Act protects only 'qualified' employees, that is, employees qualified to do the job for which they were hired; and threatening other employees disqualifies one." *Palmer*, 117 F.3d at 352–53.

In light of plaintiff's failure to establish a prima facie case of discrimination, I need not reach the remainder of the three-tier analysis. *See Quintana*, 1997 WL 40866, at *7 ("[o]nly once plaintiff has established a prima facie case of discrimination does the burden of production shift to defendant to demonstrate a legitimate and non-discriminatory reason for employee's discharge"). Although caution in granting a motion for summary judgment is in order when issues of intent and state of mind are in question, "[t]he summary judgment rule

would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.1985). Viewing the instant record in the light most favorable to plaintiff, no rational jury—with knowledge of the law—could find either that he was "otherwise qualified" to perform the essential functions of his job or that S & P's actions in terminating the plaintiff were motivated by discrimination.

 In sum, "[t]he ADA does not protect disabled employees from all adverse employment decisions", *Serrano,* 1997 WL 167042, at *5; and, this Court's role is not to "second-guess business decisions or to question a corporation's means to achieve a legitimate goal." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988). Absent discrimination, an employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not based on a discriminatory reason. *Mohamed v. Marriott Int'l Inc.,* 905 F.Supp. 141, 155 (S.D.N.Y. 1995); *see also Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1324 (10th Cir.1997) (plaintiff's contention that she capably performed her duties is of no importance where plaintiff was dismissed for excessive absenteeism rather than poor performance); *Kier v. Commercial Union Ins. Cos.,* 808 F.2d 1254, 1259 (7th Cir.1987) ("[a]n employer can fire an employee for any reason, fair or unfair, so long as the decision to terminate is not based on age or some other protected category"). Accordingly, defendant's motion for summary judgment dismissing plaintiff's claims of discriminatory discharge under the ADA is hereby granted.

### 2. *Retaliatory Discharge Claim*

To the extent that plaintiff alleges that S & P also terminated his employment on October 31, 1995 in retaliation for the filing of a discrimination complaint with the EEOC in violation of the ADA, his claim again fails.[18] Although the ADA makes it unlawful for an employer "to discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this chapter," 42 U.S.C. § 12203(a), plaintiff has not presented evidence sufficient to show that defendant's proffered reason for plaintiff's termination was merely a pretext for impermissible retaliation.

Retaliation claims under the ADA are subject to the same three-tiered burden shifting analysis established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and enunciated in *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Quinn v. Green Tree Credit Corporation,* 159 F.3d 759, 768 (2d Cir.1998). Plaintiff bears the initial burden of establishing a prima facie case of retaliation by a preponderance of the evidence. If plaintiff meets this initial burden of establishing a prima facie case, defendant must then articulate a legitimate, non-retaliatory reason for the complained action. If defendant meets its burden, plaintiff must then present evidence sufficient to show that defendant's proffered reason was merely a pretext for impermissible retaliation. *See Quinn,* 159 F.3d at 768–69; *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1308–09 (2d Cir.1995).

 To establish a prima facie retaliation claim under the ADA, a plaintiff must show that: (1) he was engaged in a protected activity; (2) he suffered an employment action disadvantaging him; and (3) there was a causal connection between the protected activity and the adverse employment action. *Quinn,* 159 F.3d at 769 (quoting *Tomka,* 66 F.3d at 1308); *see Reed v. A.W. Lawrence & Co., Inc.,* 95 F.3d 1170, 1178 (2d Cir.1996). A causal connection "can be established indirectly

---

18. S & P's motion papers do not address plaintiff's allegation of retaliation.

by showing that the protected activity was closely followed in time by the adverse action." *Manoharan v. Columbia Univ. College of Physicians and Surgeons*, 842 F.2d 590, 593 (2d Cir.1988) (citing *Davis v. State Univ. Of NY*, 802 F.2d 638, 642 (2d Cir.1986)).

■ With respect to the first prong, in order to prove that plaintiff engaged in a protected activity, he "need not establish that the conduct he opposed was in fact a violation of the [ADA]," but only that he possessed a "good faith, reasonable belief that the underlying employment practice was unlawful." *Manoharan*, 842 F.2d at 593 (citation omitted). Here, plaintiff engaged in a protected activity by filing a discrimination charge with the EEOC prior to his discharge. *See Hawkins v. Astor Home for Children*, No. 96 Civ. 8778(SS), 1998 WL 142134, at *10 (S.D.N.Y. March 25, 1998) (filing of EEOC charge is a protected activity).[19] Furthermore, the second prong—that the employer took an adverse employment action disadvantaging plaintiff—is satisfied by S & P's termination of his employment. *Quinn*, 159 F.3d at 769. In addition, the temporal proximity between the filing of the EEOC charge and the termination, plaintiff was fired less than two months after filing his charge with the EEOC, suffices to establish the causal nexus. *Id.*

■ Nevertheless, plaintiff's retaliatory discharge claim must be dismissed. S & P has demonstrated that plaintiff was fired for admitted acts of gross misconduct, thus carrying its burden of proffering a legitimate, non-retaliatory reason for terminating plaintiff's employment. Plaintiff, however, has failed to sustain his "ultimate burden of persuading the factfinder that a retaliatory motive is a 'but for' cause of the adverse employment action." *Manoharan*, 842 F.2d at 594–95. Plaintiff does not offer "concrete evidence that a reasonable jury could return a verdict in his favor," but relies on vague and conclusory allega-

tions that S & P conspired to terminate his employment since the disclosure of his disability in 1990. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir.1998) (citation omitted). Plaintiff's admission that his behavior constituted misconduct defeats his retaliation claim, regardless of his repeated contentions concerning S & P's discriminatory conduct. Despite the temporal correlation between plaintiff's filing of the EEOC charge and his termination, he has failed to establish that S & P's proffered reason for dismissing him, his misconduct, was false and that unlawful retaliation was the true reason for his discharge.

That plaintiff engaged in a protected activity by filing a discrimination charge with the EEOC does not insulate him from being discharged for his misconduct. Whether plaintiff's behavior resulted from his bipolar disorder is irrelevant, the rights afforded him under the ADA are only a "shield against employer retaliation, not a sword with which one may threaten or curse" other employees. *Hamilton v. Southwestern Bell Telephone*, 136 F.3d 1047, 1052 (5th Cir.1998) (ADA does not insulate emotional or violent outbursts blamed on an impairment); *see Klem v. Popular Ford Sales, Inc.*, 975 F.Supp. 196, 204 (E.D.N.Y.1997) (employer's reasonable defensive measures do not violate anti-retaliation provision of ADA). Plaintiff's own failure to recognize the boundaries of appropriate behavior in the workplace unfortunately led to his termination. Careful review of the record supports the conclusion that S & P's reason for terminating plaintiff's employment was misconduct, not retaliation for filing a discrimination charge with the EEOC. Therefore, plaintiff's claim of retaliation must be dismissed.

## CONCLUSION

For the forgoing reasons, the Court grants defendant's motion for summary

---

**19.** Even though plaintiff's disability discrimination claim cannot be sustained, the record supports plaintiff's "good faith, reasonable belief that [S & P] stood in violation of the law" and thus his filing of the EEOC charge is a protected activity. *Quinn*, 159 F.3d at 769.

judgment and directs the Clerk of the Court to enter judgment dismissing the complaint.

**SO ORDERED**