**Dora MORAN, Plaintiff,**

v.

**PREMIER EDUCATION GROUP, LP d/b/a Branford Hall Career Institute, Defendant.**

**No. 3:06CV01330(DJS).**

United States District Court, D. Connecticut.

Feb. 13, 2009.

---

Tani E. Sapirstein, Sapirstein & Sapirstein PC, Springfield, MA, for Plaintiff.

Tanya A. Wolanic, William Joseph Anthony, Jackson Lewis, Hartford, CT, for Defendant.

### MEMORANDUM OF DECISION

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Dora Moran ("the Plaintiff"), brings this action for damages pursuant to the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("the ADA") against her former employer, Premier Education Group, LP d/b/a Branford Hall Career Institute ("the Defendant"), alleging that the Defendant discriminated against her based on a disability and discriminated against her based on the De-

fendant's perception that she had a disability. The Plaintiff further alleges that the Defendant violated the ADA by illegally retaliating against her for engaging in protected activities.

The Defendant has filed a motion for summary judgment (dkt. # 30) pursuant to Rule 56 of the Federal Rules of Civil Procedure, and a motion to strike (dkt. # 39) portions of the Plaintiff's materials submitted in opposition to the summary judgment motion. For the reasons that follow, the Defendant's motion to strike **(dkt. # 39)** is **DENIED,** and the Defendant's motion for summary judgment **(dkt. # 30)** is **DENIED.**

## I. THE PLAINTIFF'S SUBMISSIONS

■ The Defendant moves to strike several portions of the Plaintiff's submissions. According to the Defendant: (1) the Court should disregard the Plaintiff's Local Rule 56(a)(2) statement because: (a) it does not comply with Local Rule 56(a)(2) in that it fails to contain a separate section entitled "Disputed Issues of Material Fact" containing a list of each material fact to which the Plaintiff claims there is an issue to be tried; and (b) it relies on irrelevant and immaterial facts not at issue in this matter; (2) the Court should not consider the Plaintiff's affidavit because it consists of conclusory allegations, speculation and conjecture, includes statements that are contrary to deposition testimony, and contains immaterial and irrelevant statements; (3) the Court should disregard the Plaintiff's Exhibit 11 because it has not been properly authenticated and constitutes inadmissible hearsay; and (4) the Court should disregard those portions of the Plaintiff's opposition that rely on the improper affidavit and exhibit.

The Plaintiff filed a memorandum opposing the motion to strike. Specifically, the Plaintiff asserts that paragraphs in her affidavit are based on her personal knowledge and do not contradict her deposition testimony. The Plaintiff further requested the Court to take judicial notice as to information contained in Exhibit 11 pursuant to Federal Rule of Evidence 201.

■ The undersigned has already expressed his disapproval of filing motions to strike during the summary judgment process. *See Martin v. Town of Westport,* 558 F.Supp.2d 228 (D.Conn.2008). "[I]n the context of summary judgment, motions to strike are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion." *Martin,* 558 F.Supp.2d at 231. The Court "knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision simply upon the self-serving *ipse dixit* of a particular party." *Id.* Because the Court is permitted to consider only admissible evidence, it sees no reason to strike any of the Plaintiff's submissions. Consequently, the Defendant's motion to strike **(dkt. # 39)** is **DENIED.**

## II. FACTS

In July 1999, the Plaintiff began working at the Defendant's Windsor, Connecticut campus ("the Windsor Campus") as an Instructor in its Professional Medical Assistant Program. As an Instructor, the Plaintiff taught students the skills they would need to become professional medical assistants. This instruction included training students how to give injections and use syringes safely. As an Instructor, the Plaintiff was required to abide by the Defendant's Code of Ethical Conduct Policy, which she signed on September 20, 2001, and the Defendant's Employee Handbook, dated January 1, 2004. Instructors at the Windsor Campus reported to the Director of Education, who was responsible for

overseeing the courses and instructors directly. The Director of Education reported to the School Director, who was responsible for managing the admissions process, the financial aid process, the education process, and the career services process. The Director of Education was also responsible for the operations of the building and facility.

The Plaintiff alleges that sometime during or shortly before 2004, she began to complain about cigarette smoke from a smoking area that was located outside the school but near her classroom. According to the Plaintiff, the smoke adversely affected her asthma, from which she claims to have suffered since approximately 1997. The Plaintiff alleges that she made these complaints at department head meetings to the following people: Mitchel Soriano ("Soriano"), the School Director of the Windsor campus; Marsha Shear ("Shear"), the Director of Education; Gary Camp ("Camp"), the Defendant's Chief Executive Officer; Dr. Mark Volpe ("Dr. Volpe"), the school physician; and the Director of the Defendant's Springfield, Massachusetts campus ("the Springfield Campus"), who subsequently informed Jane Parker ("Parker"), the Vice President of Campus Effectiveness. There is, however, no evidence that the Plaintiff made any formal or informal complaints or requests to the Human Resource Department.

The Plaintiff particularly maintains that she explained to Soriano her belief that her asthma was exacerbated by the condition of the ventilation system in her classroom and by the smoke, which entered the Windsor Campus building from the smoking area near the exit door. The Plaintiff allegedly requested that the smoking area be moved farther away from the school, or that her classroom be moved farther away from the smoking area. Furthermore, the Plaintiff alleges that she repeatedly requested the Defendant to check for any problems with the heating system, to have the vents cleaned, and to keep closed the exit doors near the smoking area.

During the course of her employment with the Defendant, the Plaintiff alleges that her asthma became so severe that she had a difficult time breathing on an almost constant basis regardless of whether she was at work. In particular, the Plaintiff alleges that her asthma made it feel as though she was "breathing through a straw." As a result, the Plaintiff allegedly was forced to avoid not only places where people smoke, but also people who smoke, because exposure to cigarette smoke could trigger an attack. While the Plaintiff was prescribed medications, such as Albuterol, that helped her breathe more easily, she also asserts that nothing controlled her symptoms. Furthermore, her pulmonary specialist, Dr. Boyd Hehn ("Dr. Hehn"), testified that Albuterol has serious side effects and should not be used as a control for asthma symptoms.

In July 2004 Soriano began considering the Plaintiff for the position of Program Chair of the Professional Medical Assistant Program. In September or October 2004, Soriano offered the position to the Plaintiff. The Plaintiff declined the position due to her concerns about driving at night (apparently because of the Plaintiff's poor night vision), and her asthma.

On October 15, 2004, the Plaintiff suffered a "bad asthma attack" and visited Dr. Robin Powers ("Dr. Powers"). As a result of this visit, the Plaintiff was diagnosed with an asthma exacerbation. On October 29, 2004, the Plaintiff again saw Dr. Powers and was again diagnosed with asthma exacerbations.

In January or February 2005, the Plaintiff claims that she made a complaint to the U.S. Department of Labor, Occupational Safety and Health Administration

("OSHA") about dirty carpets at the Windsor Campus, and the effect that poor indoor air quality was having on her asthma. On April 7, 2005, the Defendant received a letter from OSHA claiming that they had received a complaint on April 6, 2005 about dirty carpets and poor indoor air quality. William Anjos ("Anjos"), the Defendant's Chief Financial Officer and President of Finance, testified that Soriano thought the Plaintiff may have made the complaint. Soriano denies that he ever made such a statement. Additionally, the Plaintiff alleges that Geraldine Brassin ("Brassin"), former Director of Education for the Springfield Campus, told the Plaintiff that she was aware that the Plaintiff had filed an OSHA complaint.

On April 13, 2005, the Defendant responded to the OSHA complaint, enclosing a report from the Defendant's heating, ventilating, and air-condition contractor confirming that all classrooms and office space met OSHA's air quality requirements. No other action was taken by OSHA.

In the spring of 2005, the Plaintiff claims that she began having severe complications with her asthma on an almost daily basis. The Plaintiff alleges that there were several instances when she required immediate medical attention because she was unable to breathe. On three occasions during 2005, Dr. Powers thought the Plaintiff would have been unable to work due to her asthma condition. Furthermore, Dr. Powers testified that the Plaintiff's asthma would have made it more physically difficult for her to walk as compared with the average person, and that due to the frequency of her symptoms and the difficulty in controlling them, she would consider the Plaintiff's asthma to be severe. Dr. Hehn also testified that adult onset asthma does not tend to go away.

The Plaintiff claims she made Soriano, Camp, and Shear aware that her complaints were related to her asthma and the effect that the smoking area was having on her health. According to the Plaintiff, she spoke with Soriano about her condition on multiple occasions, but told her that he thought increased stress was causing the asthma exacerbations. The Plaintiff also claims she informed Soriano that she occasionally must take a rescue medication in the morning, which may cause her to be a few minutes late, but Soriano told her that her health issues were no excuse for tardiness. Soriano, for his part, denies ever being made aware of the Plaintiff's asthma condition during the course of her employment at the Defendant. Furthermore, Parker and Anjos also deny being aware of the Plaintiff's asthma during the course of her employment.

The Plaintiff claims that on August 22, 2005, she mailed a letter to Soriano formally requesting that her classroom be moved away from the outside smoking area and that the outside smoking area be moved farther away from the building. Soriano claims that he never received the letter. In addition, sometime in August 2005, the Plaintiff allegedly spoke to the Director at the Springfield Campus to request a transfer because, as the Plaintiff alleges, the smoke at the Windsor Campus was affecting her health and her asthma attacks were getting worse. The Plaintiff also wanted to work closer to her mother and husband. The Plaintiff did not tell anyone at the Windsor Campus why she wanted to transfer to the Springfield Campus; however, according to the Plaintiff, Parker informed the Plaintiff that she had learned the nature of the request from the Director of the Springfield campus. On August 25, 2005, the Plaintiff received notice that the Springfield Campus had not approved her request.

In the fall of 2005, the Plaintiff was scheduled to work eighteen hours per week, but she refused two of those hours, claiming that those hours were for a class in the Health Claims Specialist Program, which was not in her specialty or department. The Plaintiff states that, although her schedule often fluctuated and she had been scheduled for a similar amount of hours in the past, she had regularly been on schedule for at least twenty-four hours per week. Additionally, the Plaintiff alleges that two new instructors were hired, at least one of which was scheduled to teach a class the Plaintiff had taught previously. The Plaintiff further alleges that she had asked for more hours in the fall term, but she was not informed why her hours were cut.

On September 21, 2005, Dr. Hehn sent a letter to Soriano explaining that the Plaintiff had severe exacerbations of her asthma when she is exposed to cigarette smoke and that it would be very beneficial for her to be in a smoke-free environment. Dr. Hehn further requested assistance from Soriano in providing a smoke-free environment for the Plaintiff. The letter was addressed to the wrong town, but had the proper zip code. Soriano claims that he never received this letter. The Plaintiff, on the other hand, claims that Soriano responded to inquiries about this letter when asked, indicating that he had received it.

The events that followed are somewhat unclear. On September 22, 2005, Josephine Zapata–Vincenty ("Zapata–Vincenty"), an Instructor at the Windsor Campus, was approached by a student who explained that he had been absent the day before, but he wanted to obtain some syringes to take home, which the Plaintiff had allowed her students to do on the previous day. Zapata–Vincenty testified that it was her understanding that the distribution of syringes for students to take home violated company policy. Thereafter, Zapata–Vincenty spoke with her supervisor and Shear about the conversation she had with the student. Zapata–Vincenty testified that she was then instructed by Shear to confirm the student's statement by interviewing him and other students. Zapata–Vincenty did this by talking to the student again as well as one other student. Zapata–Vincenty's written statement, however, which was signed on September 26, 2005, alleges that she interviewed five students. She has admitted that Sam Johnson ("Johnson"), a fellow instructor at the Windsor Campus interviewed the additional three students, meaning that her written statement was not completely veracious.

At some point thereafter, Zapata–Vincenty met with Soriano to discuss the conversation she had with the first student. Soriano has testified that, at the time, he was unaware if the distribution of syringes to students violated any specific company policies. Soriano then contacted Parker, who informed him that this conduct was, in fact, prohibited. Anjos also became aware of the alleged syringe distribution. Parker then contacted the Plaintiff and asked her if she had distributed syringes for students to take home. The Plaintiff admitted that she had done so, and that she had been doing so for over a year.

Parker and Anjos then testified that they decided to terminate the Plaintiff's employment because she distributed needles for the students to take home. According to Parker and Anjos, they did not consider other disciplinary options because they were concerned that the Plaintiff would continue to distribute syringes to students. The Plaintiff, for her part, asserts that if she had been told to stop distributing syringes to students, she would have stopped.

Parker and Anjos then informed Soriano of their decision and instructed him to effectuate the termination. Soriano, Parker, and Anjos all testified that Soriano had no part in determining whether to terminate the Plaintiff's employment, although the Plaintiff asserts that Parker and Anjos sought opinions from Soriano during the decision-making process. On September 27, 2005, Soriano informed the Plaintiff that her employment had been terminated for "putting students at serious risk" and for her "failure to follow universal precaution procedures" by allowing students to take home syringes with needles.

Additionally, the Defendant maintains that the Plaintiff's actions violated four company policies: (1) The Ethical Conduct Policy which states, that instructors must "obey all school policies and procedures" and may not engage in "unauthorized or inappropriate use of school premises, equipment, supplies, or other school property"; (2) the Defendant's Employee Handbook, which prohibits the taking of company property, and specifically states, "[n]o item purchased or supplied by Premier Education Group should ever be removed from company premises without express authorization of your immediate supervisor and the proper paperwork associated with the situation;" (3) the Defendant's so-called SHARPS Policy, which states, "[a]ll used SHARPS [aka syringes or needles] are to be disposed of and all unused SHARPS need to be returned to the locked cabinet where they belong"; and (4) universal precautions, which are the proper handling of medical equipment, such as needles, to avoid and prevent the spread of disease that could be transmitted through blood-borne pathogens. While there is no dispute that the Ethical Conduct Policy was signed and dated by the Plaintiff before her termination, or that the Employee Handbook was in existence at the time of her termination, the Plaintiff and the Defendant dispute whether the Sharp's Policy was in effect at the time of her termination.

The Plaintiff has testified that she provided her students with special medical transport bags that were specifically designed for transporting medical equipment, including needles and syringes, and that the needles had protective caps. The Plaintiff also argues that she knew her students had been trained and tested in the proper methods of using, handling, and storing syringes in an appropriate and safe manner, and that she went over all these instructions before allowing students to take the needles and syringes home. Moreover, according to the Plaintiff, the taking home of the syringes was optional and intended to provide the students with practice in using syringes. The Plaintiff further testified that she had been using this practice since the time she was Acting Director of the Department, when she allegedly had permission to authorize such actions. Additionally, the Plaintiff believed that the Academic Freedom Policy permitted instructors to draw upon their professional experiences in developing their teaching techniques, and that this practice was permitted by such policy.

## III. DISCUSSION

The Defendant moves for summary judgment, arguing that there are no material facts in dispute, and that it is entitled to judgment as a matter of law because the Plaintiff has failed to present evidence sufficient to establish the alleged ADA violations. The Plaintiff argues that there are material facts at issue here, that she has presented sufficient evidence for her claims, and that the summary judgment motion should be denied. The Court shall address the parties' arguments seriatim.

## A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group v. London Am. Int'l Corp.,* 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.2d 1317, 1319–20 (2d Cir.1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. AMENDMENTS TO THE ADA

■ Before discussing the merits of the parties' arguments, the Court points out that the ADA recently has been amended. The ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (2008), substantially changes how employers and courts are to evaluate ADA claims. For example, Congress has expanded the class of major life activities to specifically include, among others, seeing and working. *Id.* at § 3(2)(A). In addition, Congress expressly rejected certain holdings of the Supreme Court in *Sutton v. United Air Lines,* 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams,* 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), which "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect" and caused "lower courts [to] incorrectly [find] in individual cases that people with a range of substantially limiting impairments are not people with disabilities." Pub. L. No. 110–325, § 2(a)(4), (5), & (6).

■ Nevertheless, the express language of the ADA Amendments Act of 2008 directed that these amendments would not take effect until January 9, 2009. *Id.* § 8. The Court normally must apply the laws and interpretations that were in force when the complained-of acts occurred. *See Landgraf v. USI Film Prods.,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Generally, a statute is not given retroactive effect "unless such construction is required by explicit language or by necessary implication." *Fernandez–Vargas v. Gonzales,* 548 U.S. 30, 37, 126 S.Ct. 2422, 165 L.Ed.2d 323 (2006). This, however, is not the case here. Moreover, it appears that every court that has addressed this issue, which includes a number of federal district courts and at least one federal appeals court, has concluded that the 2008 Amendments cannot be applied retroactively to conduct that preceded its effective date. *See Kiesewetter v. Caterpillar, Inc.,* 295 Fed.Appx. 850, 851 (7th Cir.2008); *Supinski v. United Parcel*

*Serv., Inc.,* No. 3:CV–06–0793, 2009 WL 113796, at *5 n. 6 (M.D.Pa. Jan. 16, 2009); *Walstrom v. City of Altoona,* No. 3:2006–81, 2008 WL 5411091, at *5 n. 3 (W.D.Pa. Dec. 29, 2008); *Hays v. Clark Prods., Inc.,* No. 1:07–CV–328, 2008 WL 5384300, at *6 n. 3 (S.D.Ind. Dec. 18, 2008); *Levy ex rel. Levy v. Hustedt Chevrolet,* No. 05–4832(DRH)(MLO), 2008 WL 5273927, at *3 n. 2 (E.D.N.Y. Dec. 17, 2008); *Knox v. City of Monroe,* No. 07–606, 2008 WL 5157913, at *5 n. 10 (W.D.La. Dec. 9, 2008); *Gibbon v. City of New York,* No. 07–Civ–6698, 2008 WL 5068966, at *5 n. 47 (S.D.N.Y. Nov. 25, 2008). The Court therefore applies the prevailing presumption against retroactivity and finds 2008 amendments to the ADA to be inapplicable to this case.

### C. COUNT ONE

■ In Count One of the complaint, the Plaintiff alleges that the Defendant illegally discriminated against her based on a disability. The ADA provides that, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims arising under the ADA are analyzed using the familiar burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 169 (2d Cir.2006) Under that analysis, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of

persuasion that the proffered reason is a pretext." *Id.*

■ As the Second Circuit has noted,

[t]o establish a prima facie case under the ADA, a plaintiff must show by a preponderance of the evidence that: (1) h[er] employer is subject to the ADA; (2)[s]he was disabled within the meaning of the ADA; (3)[s]he was otherwise qualified to perform the essential functions of h[er] job, with or without reasonable accommodation; and (4)[s]he suffered adverse employment action because of h[er] disability.

There is no dispute with regard to the first element of the prima facie case, and there is no dispute that the termination of the Plaintiff's employment qualifies as an adverse employment action. The parties dispute the remaining elements of the prima facie case.

#### 1. Disability Under the ADA

■ The Defendant's first argument is that the Plaintiff cannot establish the second element of her prima facie case because, during her employment with the Defendant, the Plaintiff was not "disabled" within the meaning of the ADA. The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). The Defendant asserts that courts do not assume that an individual with asthma has a disability within the protection of the ADA, as asthma does not necessarily limit major life activities substantially. Furthermore, the Defendant argues that the Plaintiff's asthma did not substantially limit her in the major life activities of breathing or working, but rather was triggered only in response to

cigarette smoke and could be controlled with medication.

In support of its motion, the Defendant has cited to a number of Second Circuit and district court cases refusing to consider a plaintiff disabled due to asthma. In particular, the Defendant cites to *Muller v. Costello*, 187 F.3d 298, 312–14 (2d Cir. 1999), where the Second Circuit rejected a plaintiff's assertion that he was disabled under the ADA because his asthma limited his ability to work in any environment that exposed him to cigarette smoke or environmental irritants. Similarly, the Defendant cites to *Burke v. Niagara Mohawk Power Corp.*, 142 Fed.Appx. 527, 529 (2d Cir.2005), where the Second Circuit found that a plaintiff who suffered from "full-fledged asthma attacks," but could work in another environment that has reasonably clean air, did not have a disability that impaired a major life activity. The Defendant also cites to *Mutts v. S. Conn. State Univ.*, No. 3:04cv1746 (MRK), 2006 WL 1806179, at *5–6 (D. Conn. June 28, 2006), where Judge Kravitz found that a plaintiff with asthma that had not developed until adulthood, and who was not told by her doctors to avoid stimuli other than exposure to multiple chemicals in enclosed spaces, was not disabled because her asthma did not substantially limit her in the major life activity of breathing. Finally, the Defendant cites *Bellom v. Neiman Marcus Group*, 975 F.Supp. 527, 533 (S.D.N.Y.1997) where the court held that a plaintiff's asthma was not a disability within the meaning of the ADA where "plaintiff failed to adduce evidence addressing the issue of how her asthma affected activities beyond that of working in the cosmetics department at Neiman Marcus."

The Plaintiff responds that there is sufficient evidence to allow a reasonable fact finder to conclude that her asthma was substantially limiting. Specifically, the Plaintiff argues that she has suffered from asthma for eleven years, which has caused her to have serious difficulty breathing on an almost constant basis regardless of whether she was at work. The Plaintiff also argues that her asthma has caused her to seek urgent medical care, made it more physically difficult for her to walk as compared to the average person, and entirely prevented her from exercising. The Plaintiff further argues that she is forced to avoid both people who smoke (even when they are not smoking) and people who associate with smokers because exposure to smoke would trigger an attack. Additionally, the Plaintiff argues that medication does not eliminate her difficulty in breathing and that she has had asthma attacks involving severe shortness of breath and chest pressure which were not alleviated even with the use of rescue medications such as Albuterol.

In considering the Plaintiff's claim under Count One for illegal discrimination based on actual disability, the Court only needs to consider whether the Plaintiff has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]" 42 U.S.C. § 12102(1)(A). Major life activities include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *Id.* § 12102(2)(A). Additionally, "substantially limits" is defined as "(i) [the inability] to perform a major life activity that the average person in the general population can perform; or (ii) [a significant restriction] as to the condition, manner, or duration under which an individual can perform a major life activity as compared to ... the average person in the general population...." 29 C.F.R. § 1630.2(j)(1). The Code has also promulgated a list of factors to consider whether

an individual is substantially limited, which include, "(i) [t]he nature and severity of the impairment; (ii)[t]he duration or expected duration of the impairment; and (iii)[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* § 1630.2(j)(2).

While the Defendant presents a number of cases where courts have found that asthma did not substantially limit a major life activity, the facts in those cases are dissimilar to the facts here. The Plaintiff alleges that she has been suffering from asthma for eleven years, which has caused serious difficulty breathing. She testified that her asthma made it feel as though she was trying to breathe through a straw. She also alleged that she has a difficult time breathing on an almost constant basis whether or not she is at work, which made it more physically difficult for her to walk and entirely prevented her from exercising. In *Burke*, on the other hand, the plaintiff's "testimony indicate[d] that her attacks [were] infrequent, and that her daily symptoms c[ould] be controlled with medication." *Burke*, 142 Fed.Appx. at 529. Furthermore, in *Mutts*, the plaintiff testified that she actually was able to *smoke* without aggravating her condition. *Mutts*, 2006 WL 1806179, at *6.

Still, the Defendant notes that where "a plaintiff suffers asthma attacks only in response to particular stimuli and is able to engage in almost all normal life activities, courts have been disinclined to conclude that the plaintiff is substantially limited in the major life activity of breathing." *Id.* at *5. Nonetheless, the Plaintiff here has testified that her asthma is exacerbated by cigarette smoke itself (which is not an isolated stimulus that the Plaintiff would encounter only at her workplace), by cigarette smokers, and by people who associate with cigarette smokers. Encountering

cigarette smoke, cigarette smokers, or people who associate with cigarette smokers, can be a common, daily occurrence, and the Plaintiff in fact claims to suffer from asthma on an almost constant basis, regardless of whether she is at work.

■ The Defendant correctly notes that a plaintiff's own statements are insufficient to support a claim of disability without supporting medical testimony. The Plaintiff, though, has provided medical testimony to support her claim of disability. The Plaintiff's treating physician, Dr. Powers, considered the Plaintiff to have severe asthma due to the frequency of her symptoms and the difficulty in controlling her symptoms with medication. Dr. Powers also noted that the Plaintiff was forced to seek urgent care on a number of occasions, and testified that the Plaintiff's asthma could have made it significantly more difficult for her to walk than for the average person. As the Court indicated above, walking is considered a "major life activity," and being "substantially limited" in a major life activity can be defined as having a significant restriction as to the condition, manner, or duration under which an individual can perform the major life activity as compared to the average person in the general population.

The Defendant also correctly points out that corrective measures "must be taken into account when judging whether [a] person is 'substantially limited' in a major life activity." *Sutton*, 527 U.S. at 482, 119 S.Ct. 2139. Nevertheless, although the Plaintiff in this case had a prescription for Albuterol, a rescue medication for asthma, she has alleged that it did not alleviate her shortness of breath and chest pressure under all circumstances. The Plaintiff's pulmonary specialist, Dr. Hehn, also noted that while the Plaintiff has a prescription for Albuterol, it has serious side effects

and should not be used as a control for her asthma. In addition, Dr. Hehn testified that adult onset asthma does not tend to go away. Therefore, in light of the above, the Court finds that there are sufficient material facts in dispute to warrant precluding summary judgment on the basis that the Plaintiff does not suffer from a disability.

### 2. Knowledge of the Disability/Request for a Reasonable Accommodation

 The Defendant's next two arguments are that the Plaintiff's claim for disability discrimination fails because the Defendant had no knowledge that the Plaintiff had asthma and because the Defendant never received a request for a reasonable accommodation from the Plaintiff. With regard to the legal standards for these issues, the Court agrees with the Defendants. Logic dictates that if the Defendant had no knowledge of the Plaintiff's asthma, it could not have discriminated against the Plaintiff because of her asthma, and if the Defendant never received a request for a reasonable accommodation from the Plaintiff, it could not have discriminated against her by denying that accommodation.

That being said, the Court cannot grant summary judgment on these bases. Quite simply, there is a issue of fact as to whether the Plaintiff informed the Defendant about her asthma. The Plaintiff has testified that she did inform the Defendant about her asthma, but the Defendant denies that she did so. As a result, there is a question regarding the parties' credibility, which must be determined by the finder of fact at trial, not by the Court on summary judgment. The same holds true for the reasonable accommodation issue. The Plaintiff has testified that she made a request to her superiors, but the Defendant denies that this occurred. The Court can-

not decide on summary judgment whom to believe.

### 3. Qualified to Perform the Essential Functions the Job

 The Defendant next argues that the Plaintiff was not qualified for her job when it terminated her employment. According to the Defendant, the Plaintiff violated the Defendant's policies and procedures by allowing her students to take syringes home with them, which put them and their families at risk. The Defendant maintains that the Plaintiff's inability to perform this essential job function is fatal to her disability discrimination claim.

The Court is not persuaded by this argument. To begin with, the Plaintiff and the Defendant dispute whether the SHARP's Policy, which dictated that all unused syringes needed to be returned to the locked cabinet where they belong, was in effect at the time of her termination. Moreover, it appears that during the time the Plaintiff was allowing students to take syringes home, Soriano, the Plaintiff's supervisor, was himself unaware if distributing syringes in this way violated any specific company policies. In addition, the Court does not see how there can be a serious dispute as to whether the Plaintiff had the requisite knowledge or skill for her position considering that Soriano offered a promotion the Plaintiff.

The cases to which the Defendant cites in support of its argument here also do not persuade the Court. In some of the cases, the courts found that plaintiffs ceased to be otherwise qualified for their positions when they engaged in misconduct that violated workplace policies. *See, e.g., Valentine v. Standard & Poor's*, 50 F.Supp.2d 262 (S.D.N.Y.1999). From what the Court can discern, however, those cases are distinguishable because they involved situations where the plaintiff was violent, or where the policy violations often consisted

of threats, sometimes of physical violence, against co-workers. In *Valentine,* for example, the plaintiff left an obnoxious and taunting voice mail message for a co-worker, calling this coworker an alcoholic, questioning his sexual orientation, and essentially threatening to ruin his reputation. *See id.* at 269. This is not the situation here. Moreover, the Second Circuit has held that a plaintiff's misconduct at work, including threats, does not necessarily correspond to the question of whether that plaintiff was qualified for his position. *See Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 172 (2d Cir.2006) (holding that the plaintiff's misconduct at work, which constituted making a threat against his supervisor, "go[es] to the employer's ability to *rebut* a prima facie case in the second stage of the *McDonnell Douglas* framework, not to the showing of the prima facie case itself. The issue of 'threats' comes into play only *after* the prima facie requirement has been met.") (emphasis in original).

In addition, this is not a situation where the Plaintiff's alleged violation of the Defendant's policies and procedures, which may implicate public safety concerns, was a manifestation of her disability. *See Altman v. New York City Health and Hosps. Corp.,* 100 F.3d 1054 (1996). In *Altman,* to which the Defendant cites, the Second Circuit upheld the district court's conclusion that the plaintiff's disability prevented him from performing in a reasonable manner the activities involved in his position. *Id.* at 1061. Here, however, the Plaintiff's asthma is wholly unrelated to the alleged policy violation. There is no indication that the Plaintiff's distribution of the syringes (i.e., the alleged policy violation that

the Defendant claims made the Plaintiff unqualified for her position) was caused by her asthma. Consequently, the Court shall not grant summary judgment on the basis that the Plaintiff was not qualified for her position.

### 4. Causation

■ With regard to the fourth element of the prima facie case, the Defendant argues that the Plaintiff has not established the inference that her termination occurred because of her asthma. The Court is not persuaded here. The Plaintiff's burden in establishing her prima facie case is minimal. There is evidence in the record showing that the Plaintiff's coworkers and supervisors considered her to be a good worker and employee, yet the Defendant, instead of imposing alternate forms of discipline, terminated the Plaintiff for her alleged misconduct even though it appears this was her first offense. There is also evidence that the Defendant terminated the Plaintiff instead of using other forms of discipline because her supervisors did not think they could trust the Plaintiff to stop distributing the syringes to students even if she were told to do so, yet those same supervisors admit that there were no prior instances of the Plaintiff not following her supervisor's instructions. In addition, Soriano himself was unaware if the Plaintiff's distribution of the syringes in this way violated any specific company policies, raising questions about the clarity of those policies at the time. In the Court's view, then, the Plaintiff has met the *de minimis* burden for her prima facie case. Consequently, with regard to Count One, the Defendant's motion for summary judgment (**dkt. # 30**) is **DENIED.**[1]

---

1. The Defendant provides incomplete arguments on the remaining *McDonnell Douglas* burden-shifting elements, namely, the legitimate, non-discriminatory reason for the termination, and pretext. The Court notes,

though, that the Defendant consistently has provided a legitimate, non-discriminatory reason for the termination, and that this would satisfy its burden under the *McDonnell Douglas* analysis. Nevertheless, the Defendant

## D. COUNT TWO

 In Count Two of the complaint, the Plaintiff alleges that the Defendant violated the ADA by illegally discriminating against her based on a perceived disability. The ADA not only prohibits discrimination based on an employee's actual disability, it prohibits discrimination based on perceived physical or mental impairments. *See* 42 U.S.C. § 12102(1)(C), (4). That is, a plaintiff can be considered disabled under the ADA even if she is not disabled, but her employer wrongly believes she is. *See Sutton,* 527 U.S. at 489, 119 S.Ct. 2139.

 The Defendant argues that, because it did not have knowledge of the Plaintiff's asthma, it could not have perceived her as disabled. The Court points out that, for a claim of perceived disability, what the Defendant *actually knew* is not relevant; instead, what the Defendant *believed to be true* is relevant. Thus, this argument is not persuasive.

More to the point, however, is the fact that the Plaintiff claims to have told her supervisors about her asthma. The Defendant denies this assertion, but, as noted above, the resolution of that issue is one for the jury. If the jury were to find the Plaintiff's testimony to be credible, it could also find that the Defendant regarded the Plaintiff to be disabled under the ADA (even if she were not, in fact disabled). As noted in the analysis for Count One, the Court cannot resolve this issue on summary judgment. Consequently, with regard to Count Two, the Defendant's motion for summary judgment **(dkt. # 30)** is **DENIED.**

does not discuss or analyze the final element of pretext, and, as a result, the Court shall not

## E. COUNT THREE

 In Count Three of the complaint, the Plaintiff alleges that the Defendant violated the ADA by retaliating against her because she engaged in protected activities. The ADA prohibits retaliation because of a person's opposition to any act or practice that the ADA prohibits. 42 U.S.C. § 12203(a); *see McInerney v. Rensselaer Polytechnic Inst.,* 505 F.3d 135, 138 (2d Cir.2007). ADA retaliation claims, like ADA discrimination claims, are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002). "In order to establish a prima facie case of retaliation, [a plaintiff] must show that: (1)[s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against h[er]; and (4) a causal connection exists between the alleged adverse action and the protected activity." *Id.*

 The Defendant first argues it had no knowledge that the Plaintiff engaged in a protected activity. The Defendant admits, however, that requesting a reasonable accommodation constitutes a protected activity under the ADA. *See Weixel v. Board of Educ. of City of New York,* 287 F.3d 138, 149 (2d Cir.2002). The basis for the Defendant's argument rests on its assertion that it was not aware of any reasonable accommodation request. This argument is unpersuasive. As with the Defendant's assertion that it was not aware of the Plaintiff's asthma, this assertion is contradicted by the Plaintiff, who has testified that she did make reasonable accommodation requests, and submitted evidence that Dr. Hehn sent a letter to Soriano specifically requesting that the

rule on that issue.

Plaintiff work in a smoke-free environment.[2] Thus, the Court cannot grant summary judgment on this basis.[3]

The Defendant next argues that the Plaintiff has not established a causal connection between her alleged protected activity and her termination. The Second Circuit has held that "a close temporal relationship between a plaintiff's participation in protected activity and an employer's adverse actions can be sufficient to establish causation." *Treglia,* 313 F.3d at 720. In late August 2005 and late September 2005, the Plaintiff and Dr. Hehn allegedly sent letters requesting that the Plaintiff be accommodated so that her asthma would not be exacerbated.[4] The Defendant terminated the Plaintiff's employment less than a week after Dr. Hehn apparently sent his letter. In the Court's view, this is sufficient to satisfy a causal connection.

Finally, the Defendant argues that there is insufficient evidence to demonstrate that its reason for terminating the Plaintiff was pretextual, i.e., that the Defendant's proffered reason was not the true reason. The Court, however, believes there are serious unresolved factual questions in this case, which the Court has described above, that preclude a finding in favor of the Defendant on this issue. Furthermore, considering the Plaintiff appears to have received no complaints of misconduct prior to the policy violation claimed here, the Court also believes that the lack of any warning or progressive discipline by the Defendant, *see* discussion *supra* Part C.3, could lead a reasonable jury to find pretext. Consequently, with regard to Count Three, the Defendant's motion for summary judgment (**dkt. #30**) is **DENIED.**

## IV. CONCLUSION

For the foregoing reasons, the Defendant's motion to strike (**dkt. #39**) is **DENIED,** and the Defendant's motion for summary judgment (**dkt. #30**) is **DENIED.**

2. Dr. Hehn's letter is a point of controversy between the parties because Soriano claims that he never received it. The Plaintiff, on the other hand, testified that she had spoken to Soriano about this letter, and he had indicated that he was aware of it. Further complicating matters is the fact that Dr. Hehn addressed the letter to "Winchester, CT" instead of "Windsor, CT." Dr. Hehn did, however, place the correct ZIP Code for Windsor, "06095," on the letter. The U.S. Postal Service's web site indicates that if a ZIP Code does not match the city or state on a mailing address, the Postal Service will dispatch the mail first according to the ZIP Code, and if the mail cannot be delivered at the address within that ZIP Code, it will be forwarded to the Post Office within the stated city and state. *See* http://faq.usps.com/eCustomer/iq/ usps/request.do?create=kb:USPSFAQ. In addition, it does not appear that the letter was returned to Dr. Hehn as undeliverable. In the Court's view, it is for the jury to decide whether the Plaintiff or Soriano is credible in this situation.

3. It appears that the Plaintiff has abandoned any assertion that her OSHA complaint can support her ADA retaliation claim. In its memorandum of law in support of summary judgment, the Defendant presents ADA retaliation arguments regarding the OSHA complaint, but the Plaintiff, in her opposition, fails to address the OSHA complaint as it relates to her retaliation claim. Therefore, the Court shall consider any retaliation claim based on the OSHA complaint to be abandoned. *See Coltin v. Corp. for Justice Mgmt., Inc.,* 542 F.Supp.2d 197, 206 (D.Conn.2008).

4. Again, whether Soriano received these letters is disputed. The Court does not find that Soriano did receive the letters, but on the other hand, it cannot find as a matter of law that he did not. Ultimately, this is a determination that must be made by the jury.